Sarah MOORE, on behalf of herself and others similarly situated, Plaintiff,

v.

**ULTA SALON, COSMETICS & FRAGRANCE, INC., a Delaware corporation, et al., Defendants.**

Case No. CV 12-3224 FMO (AGRx)

United States District Court,
C.D. California.

Signed 11/16/2015

Timothy K. Hobbs, II, Kristin Hobbs, Hobbs Law Group, Glendora, CA, Alejandro D. Blanco, The Blanco Law Firm PC, Glendale, CA, Dennis Patrick Wilson, Law Offices of Dennis P. Wilson, Burbank, CA, for Plaintiff.

Alexis A. Sohrakoff, John C. Kloosterman, Kai-Ching Cha, Littler Mendelson PC, San Francisco, CA, for Defendant.

## ORDER Re: PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Fernando M. Olguin, United States District Judge

The court has reviewed and considered the oral argument and all the briefing filed with respect to Plaintiff's Motion for Class Certification ("Motion"). For the following reasons, the court **grants** the Motion.

### *INTRODUCTION*

Plaintiff Sarah Moore ("Moore" or "plaintiff") filed this wage and hour class action lawsuit against Ulta Salon, Cosmetics, & Fragrance, Inc. ("Ulta" or "defendant") in California state court on March 2, 2012. (*See* Notice of Federal Court Removal by Defendant Ulta Salon, Cosmetics & Fragrance, Inc. Pursuant to 28 U.S.C. §§ 1332, 1441, and 1446 ("NOR"), Exhibit ("Exh.") A). Defendant removed the case to this court on April 12, 2012. (*See* NOR). Moore was employed by Ulta at its Glendora, California store as an Arch Expert from September 28, 2011, through March 12, 2012.[1] (*See* Appx. of

---

1. Although Moore states in her declaration that she "occasionally worked at the Pasadena, California store[, and that t]he exit inspection procedure was identical in each store[,]" Moore clarified during her deposition that she had only once worked at the Pasadena store. (*See* Declaration of Dennis P. Wilson, Esq. in Support of Motion for Class Certification ("Wilson Decl."), Exh. 18 (Declaration of Plaintiff Sarah Moore in Support of Plaintiff's Supplemental Memorandum ("Moore Decl.") at ¶ 2; Appendix of Evidence in Support of Defendant's Opposition to Plaintiff's Motion for Class Certification ("Appx. of Evid."), Exh. 5 (Declaration of Kai–Ching Cha in Support

Evid., Exh. 25 (Declaration of Anita Ryan in Support of Defendant's Opposition to Plaintiff's Motion for Class Certification ("Ryan Decl.")) at ¶ 4); Moore Decl. at ¶ 2).

On September 13, 2012, plaintiff filed the operative First Amended Class Action Complaint ("FAC"), on behalf of herself and individuals currently and formerly employed by Ulta as nonexempt employees. (*See, generally,* FAC). In the FAC, plaintiff alleges that Ulta fails to compensate employees for time spent off the clock undergoing mandatory exit inspections. (*See id.* at ¶ 19). The FAC asserts claims for: (1) failure to pay overtime compensation, Cal. Lab.Code § 1198, *et seq.*; (2) failure to compensate for all hours worked, Cal. Lab.Code § 1198, *et seq.*; (3) failure to pay all wages due upon discharge, Cal. Lab.Code § 201, *et seq.*; (4) failure to provide required meal periods, Cal. Lab.Code § 226.7, *et seq.*; (5) failure to authorize or permit required rest periods, Cal. Lab.Code § 226.7, *et seq.*; (6) failure to maintain required records, Cal. Lab.Code § 1174.5, *et seq.*; (7) waiting time penalties, Cal. Lab.Code § 203; and (8) unfair competition, Cal. Bus. & Prof.Code § 17200, *et seq.* (*See id.* at ¶¶ 33–102).

Plaintiff filed the instant Motion seeking to certify this case as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), appointing plaintiff as class representative, and appointing class counsel. (*See* Motion at 1). Defendant filed an Opposition to Plaintiff's Motion for Class Certification ("Opp."),[2] and plaintiff subsequently filed a Reply, and an Errata.

The proposed class to be certified is defined as follows: "[C]urrent and former nonexempt employees who were employed by Ulta and who worked in any Ulta store in California at any time from March 2, 2008, through the conclusion of this action[.]" (*See* Motion at 2).

## BACKGROUND

Ulta sells and provides salon products and services in stores located in the United States. (*See* Opp. at 2). It has operated in California since 2001 and, at the time of the parties' briefing, had approximately 69 stores in California, with approximately half of those stores opening within the previous two years. (*See* Ryan Decl. at ¶ 2). The California stores are large-scale, ranging in square footage from 7,706 to 14,948 (*see* Motion at 4; Wilson Decl. at Exh. 11), and most are built to similar specifications. (*See* Wilson Decl., Exh. 3 (Deposition of Dominick Archer) ("Archer Depo. I")[3] at 9). With the excep-

of Defendant's Opposition to Plaintiff's Motion for Class Certification ("Cha Decl.")), Exh. B (Deposition of Sarah Moore ("Moore Depo. II")) at 195–196). Because both parties submit and cite to the Moore deposition, the court will refer to the deposition as "Moore Depo. I" when cited by plaintiff, and "Moore Depo. II" when cited by defendant.

**2.** Plaintiff requests that the court strike defendant's Opposition because it was not timely filed. (*See* Reply to Defendant's Opposition to Motion for Class Certification ("Reply") at 1–2; Notice of Errata Re: Plaintiff's Reply Brief Submitted in Response to Defendant's Opposition to Certification ("Errata") at 2). Plaintiff reasons that the parties' stipulation seeking modification of certain discovery and trial deadlines provided that the Opposition would be filed on September 19, 2013. (*See* Reply at 2). Although the Order Modifying Discovery and Trial Schedule set a deadline by which a Motion for Class Certification had to be filed, no such deadline was set for the filing of opposition and reply papers. (*See* Court's Order of May 23, 2013). The Local Rules state that opposition briefing must be filed 21 days before the noticed hearing date. *See*

Local Rule 7–9. Plaintiff set the hearing for November 21, 2013, and Ulta filed its opposition 21 days prior, on October 31, 2013. (*See* Opp.). Accordingly, defendant's Opposition was timely.

Plaintiff also requests that the court disregard Ulta's supporting declarations based on Ulta's failure to identify such witnesses in response to discovery or in its Initial Disclosures, thus depriving plaintiff the opportunity to depose them. (*See* Reply at 2–3). Plaintiff's Errata asks that court to disregard the initial basis for challenging defendant's declarations and instead seeks such a sanction "because all of [the declarants] should have been identified months ago by name in [defendant's] Initial Disclosures." (*See* Errata at 2). Although defendant arguably should have identified the declarants by name during the discovery process, the failure to do so does not, under the circumstances of this case, prejudice plaintiff or otherwise affect the court's conclusion.

**3.** Because both parties submit and cite to the deposition of Dominick Archer, the court will refer to the deposition as "Archer Depo. I" when cited by plaintiff, and "Archer Depo. II" when cited by defendant.

tion of the General Manager, all store employees, including managers and supervisors, are hourly-paid, non-exempt employees. (*See* Ryan Decl. at ¶ 3).

### A. *Ulta's Employee Inspection and Timekeeping Policies.*

Plaintiff contends that Ulta requires all hourly employees to undergo an exit inspection (also referred to as a bag check) each time an employee leaves the store, whether for a rest break, meal break, or at the end of a shift. (*See* Motion at 2, 5; Wilson Decl., Exh. 1 ("2011 Ulta Employee Handbook") at D221 ("All employees are required to have package/purse/pocket inspections conducted by management anytime they exit the store (lunch, breaks, end of shift.)"); Archer Depo. I at 42–43 (understands that all employees must go through exit inspections)). Moore asserts that "exit inspections are always performed after the employee has clocked out or, if the employee is taking a break, while the employee is already on their rest break." (Motion at 6). Plaintiff further contends that the exit inspections are based on a standard policy applicable to all hourly employees in Ulta's California stores. (*See id.* at 2, 4–6).

The policies plaintiff describes are contained within a number of manuals and hand-

**4.** Plaintiff lodged a copy of the Employee Handbook/New Hire Orientation booklet plaintiff received from Ulta during her orientation. (*See* Notice of Lodging of Physical Exhibit: Employee Handbook/New Hire Orientation ("Notice of Lodging")). One section of the booklet is entitled "Employee Handbook," while the other is entitled "New Hire Orientation." For purposes of clarity, the court will refer to the New Hire Orientation section of the booklet as the New Hire Orientation manual. (*See, e.g.,* Ryan Decl. at ¶ 8, which uses the term "manual" when referring to the New Hire Orientation section.)

**5.** Plaintiff did not submit the exhibits used or referenced in the Archer deposition with her Motion, which rendered many of the citations to his deposition confusing or unhelpful. The Motion refers to the 2011 Employee Handbook and the 2011 Ulta New Hire Orientation manual submitted as Exhibits 1 & 2 to the Wilson Decl.; however, the deposition testimony cited appears to relate to the 2012 "Associate Handbook" (with the New Hire Orientation section), which was submitted with the Supplemental Declaration of Dennis P. Wilson, Esq. in Support of Reply Brief in Support of Motion for Class Certification

books. First is the "New Hire Orientation" section of the Ulta Employee Handbook. (*See* Motion at 3–4; 2011 Employee Handbook; Wilson Decl., Exh. 2 ("2011 New Hire Orientation manual")[4] at D23447)). The policies contained in the Employee Handbook, including the New Hire Orientation section, apply throughout California. (*See* Archer Depo. I at 30–31 (stating that the policies and procedures in the 2012 Associate Handbook[5] apply to all Ulta stores in California); *id.* at 42–43 (all employees must follow the exit inspection policy as reflected in the 2012 Associate Handbook); *id.* at 113 (the 2012 Associate Handbook is used throughout the United States)). The 2011 New Hire Orientation manual includes a chart entitled "End of Shift Routine" that identifies certain tasks and expectations regarding those tasks. (*See* 2011 New Hire Orientation manual at D238–39). The chart identifies the following tasks, presented in the following order:

- "Clean up/close all incomplete projects"
- "Return name badge to designated location"
- "Touchbase [sic] with Sales Floor Manager"
- "Enter any tips received for salon service (salon professionals and arch experts only)"

("Wilson Supp. Decl.") at Exhibit 26 ("2012 New Hire Orientation manual"). Because Archer testified that the 2010–2012 versions had not substantially changed, the court considered Exhibit 26. The court has also considered Exhibits 27–30, which counsel represents were introduced as exhibits at the Archer deposition. (*See id.* at ¶¶ 4–7).

However, the court declines to consider the other exhibits attached to the Wilson Supp. Decl. First, the 500–plus pages of exhibits were belatedly filed, and the court will not consider evidence raised for the first time on reply. *See Tovar v. U.S. Postal Serv.,* 3 F.3d 1271, 1273 n. 3 (9th Cir.1993) ("To the extent that the [reply] brief presents new information, it is improper."). In any event, the evidence submitted does not change the court's conclusions below. Second, with the exception of one exhibit (defendant's interrogatory response), the exhibits were not mentioned, much less discussed, in the Reply, leaving the task of determining their relevance to the court. For instance, plaintiff submitted several deposition transcripts in condensed form (four pages reduced to fit on one page) (*see, e.g., id.* at Exhs. 31–35), without providing any citations to them. (*See, generally,* Reply).

- "Clock out (hourly employees only)"
- "Unlock your belongings"
- "Bag checked at the front"

(*Id.*).[6] With respect to the "Unlock your belongings" task, the chart includes the following bullet points: "ULTA is not responsible for lost or stolen items[;] [l]ockers should remain locked when not in use[; and] [p]ersonal belongings should not be gathered until you are clocked out for the day."[7] (*Id.* at D239).

With respect to the final task—"Bag checked at the front"—the chart states the following: "[n]ever leave the building without being checked out by a manager ... [and] [m]anagement reserves the right to check bags, coats, and backpacks." (2011 New Hire Orientation manual at D239).[8] It is the responsibility of the employee to notify a manager that he or she is in need of an exit inspection. (*See* Wilson Decl., Exh. 5 (excerpts from People Manual ("People Manual")) at D78). The 2011 Employee Handbook provides further instructions regarding exit inspections:

> All employees are required to have package/purse/pocket inspections conducted by management anytime they exit the store ... Employees should only bring to work their personal items (in the plastic purse), lunches, or any personal use equipment. Employees who transport their own personal use equipment (hair dryers, curling irons, etc.) in and out of ULTA should carry these items in a clear/transparent bag. All plastic purses, lunch bags, and other bags will be inspected, and employees are required to show the contents of their pockets. Inspections are conducted at the front of the store, preferably near the exit. Management should ensure that

employees also inspect them when leaving at closing.

(2011 Employee Handbook at D221; analogous provision in 2012 Associate Handbook at 22). These policies make clear that bag checks are required any time an employee leaves the store, not just at the end of a shift. (*See, e.g.,* 2011 Employee Handbook at D220–21 (One "important polic[y] and procedure[ ] that appl[ies] to ULTA operations[,]" with which employees are "expected to comply" is that "[a]ll employees are required to have package/purse/pocket inspections conducted by management anytime they exit the store (lunch, breaks, end of shift)"; *id.* at D226 ("ULTA is a smoke-free environment. If you leave the store for your break, you must check out with a member of management"); *id.* at D230 (reminding employees that the "[p]urse check policy applies whenever [they] leave the store"); *see* analogous provisions in the 2012 Associate Handbook at 24; *see also* 2011 New Hire Orientation manual at D245 ("Routine bag and coat checks are completed when leaving the store.").

The "plastic purse" reference in the preceding paragraph is to the type of bags that Ulta allows its employees to bring into the store. (*See* 2011 Employee Handbook at D220; 2012 Associate Handbook at 21). Ulta's policy states:

> As a condition of employment, employees are required to use a plastic purse when bringing in personal items (wallet, makeup, etc.) to work. Management must approve the size of any plastic purse that an employee provides. Employees are discouraged from bringing in any items to work, other than basic necessities. Use of the plastic purses greatly speeds up the

---

**6.** The wording of the 2012 New Hire Orientation manual is slightly different, although the overall task list is the same. (*See* 2012 New Hire Orientation manual at 39–41) (page citations to the 2012 New Hire Orientation manual are to the ECF generated pages). The tasks that were revised include: "Touch base with guest experience manager"; "Use Kronos to enter any tips received for services (CA and select stores)"; "Clock out—Kronos at POS (CA and select stores)"; "Unlock your locker to access your belongings"; and "Bag check at the front." (*Id.*).

**7.** This sentence is not included in the 2012 New Hire Orientation manual. (*See, generally,* 2012 New Hire Orientation manual at 41).

**8.** The 2012 New Hire Orientation manual requires that associates "[n]ever leave the building without seeing [his or her] manager for a bag check." (*See* 2012 New Hire Orientation manual at 41). It contains identical language regarding management's reservation of rights to check personal items. (*Id.*).

exit inspection procedures, and minimizes loss of product.

(2011 Employee Handbook at D220 [9]; *see also* People Manual at D77; Archer Depo. I. at 13 ("When an employee is hired, we will issue them a clear bag that they can use for their personal belongings that come in and out of the store.").

The handbooks and manuals state that these policies are mandatory. For example, the 2011 Employee Handbook states that the loss prevention policies—which include the exit inspection requirement—"are important policies and procedures that apply to ULTA operations[,]" and employees "are expected to comply with all of them." (*See* 2011 Employee Handbook at D220, analogous provision in 2012 Associate Handbook at 21). The Loss Prevention chapter of the People Manual states that "[a]ll personnel should be familiar with these policies and procedures, and they are expected to comply with all of them." (People Manual at D77). In the case of a policy violation, the employee "will be required to comply with the policy immediately or be subject to the next level of discipline up to and including termination." (*See* 2011 Employee Handbook at D218, analogous provision in 2012 Associate Handbook at 20).

Finally, Ulta's manuals and handbooks mandate legally compliant timekeeping. (*See* People Manual at D111 ("The Company expects all exempt management to punch once a day, and all non-exempt management and non-exempt employees to punch in at the beginning of the shift, punch out and back in for meal periods, and punch out at the end of a shift. Failure to punch as prescribed is considered a time clock violation and will not be tolerated."); *id.* ("At no time should an employee be authorized to work off the clock or on their 'own time'."); *id.* at D127 ("Employees on meal periods must be uninterrupted, relieved of all duties, and free to leave the premises. Rest breaks are paid, and employees are not required to punch out for rest breaks."); *see also* 2011 Employee Handbook at D223 ("Employees who work 'off the clock' or falsify their time records are

subject to disciplinary action up to and including termination … It is also a violation for a manager to allow a non-exempt (hourly) employee to work 'off the clock'.")).

**B.** *Evidence Related to Employee Inspection Practices.*

Plaintiff asserts that Ulta has "systematically undercompensated employees through [these] unlawful policies uniformly applied in California" because they result in unpaid "off-the-clock time spent inside the stores waiting for exit inspections." (*See* Motion at 2; *id.* at 4–5 (referring to the handbooks and manuals, which "evidenc[e] the uniformity of [Ulta's] policies"). Defendant, on the other hand, asserts that variations in employee experiences preclude class certification. To begin with, defendant argues that plaintiff's claim is based on a misunderstanding of the handbooks and manuals—which, it argues, do not require clocking out before a bag check—and a "mischaracterization of the deposition testimony of Ulta's Director of Loss Prevention[.]" (*See* Opp. at 4) (referring to the deposition of Dominick Archer). In any event, defendant asserts, "that some individual managers occasionally make some employees wait to have their bag[s] checked [ ] depends on individualized factors" because the wait, if any, "depends on the individual manager, the manager's activities, and other factors such as store layout and time of day." (Opp. at 2).

**1. Plaintiff's Allegations and Contentions.**

Plaintiff contends that the exit inspection process has been implemented throughout defendant's stores pursuant to company-wide policies. (*See* Motion at 6, citing 2011 Ulta New Hire Orientation manual at D238–39). According to plaintiff, when employees complete their shifts or want to leave the store, they must go to the back of the store to collect their belongings from their lockers, clock out (unless they are leaving for a rest break), and then proceed to the front of the store where they wait for a manager to inspect them before exiting the store. (*See*

---

**9.** Although the 2012 Associate Handbook uses "associate" instead of "employee" the quoted paragraph is otherwise identical. (*See* 2012 Associate Handbook at 21).

Motion at 6, citing 2011 Ulta New Hire Orientation manual at D238–39; Wilson Decl., Exh. 4 (excerpts of Deposition of Sarah Moore) ("Moore Depo. I") at 167 & 171 (describing her experience from the point she clocked out through the exit inspection); Wilson Decl., Exhs. 19–24 [10] (collectively, "Supporting Declarations"). Plaintiff maintains that "exit inspections are always performed after the employee has clocked out or, if the employee is taking a break, while the employee is already on their rest break." (Motion at 6, citing 2011 Ulta New Hire Orientation manual at D238–39; Archer Depo. I at 28–29 (with respect to lunch break, if an employee is carrying something subject to search he or she would clock out and then undergo the exit inspection), 54–55 (prior to 2012, employees were required to clock out, then proceed to the front of the store for a bag check), 129 (last thing is a bag check at the front of the store); Wilson Decl., Exh. 15 (Defendant Ulta Salon, Cosmetics & Fragrance, Inc.'s Response to Plaintiff's Request for Admissions, Set No. One at 4 & 6; Moore Decl.; Supporting Declarations).

The Supporting Declarations submitted by plaintiff from six Ulta employees all state: "When I refer to an 'exit inspection' I am referring to the process by which hourly employees were required by Ulta Salon to clock out and then proceed to the front of the store to wait for a manager to check them out." (Wilson Decl., Exh. 19 (Declaration of Richard Medina Concerning Defendant's Wage, Hour, and Meal Break Policies ("Medina Decl.") at ¶ 5); Wilson Decl., Exh. 20 (Declaration of Estaffania Ocampo Concerning Defendant's Wage, Hour, and Meal Break Policies ("Ocampo Decl.") at ¶ 5); Wilson Decl., Exh. 21 (Declaration of Kristin Taff Concerning Defendant's Wage, Hour, and Meal Break Policies ("Taff Decl.") at ¶ 5); Wilson Decl., Exh. 22 (Declaration of Joyce Khremian Concerning Defendant's Wage, Hour, and Meal Break Policies ("Khremian Decl.") at ¶ 5); Wilson Decl., Exh. 23 (Declaration of Vivian Barzotti Concerning Defendant's Wage, Hour, and Meal Break Policies ("Barzotti Decl.") at ¶ 3); Wilson Decl., Exh. 24 (Declaration of Christina Mower Concerning Defendant's Wage, Hour, and Meal Break Policies ("Mower Decl. II") at ¶ 6)).[11] They state that they were required to undergo an exit inspection each time they left the store for a rest break, a meal break, and/or at the end of a shift (see Medina Decl. at ¶¶ 6–8; Ocampo Decl. at ¶¶ 6–8; Taff Decl. at ¶¶ 6–8; Khremian Decl. at ¶¶ 6–8; Barzotti Decl. at ¶ 4 (limited to end of shift inspection); Mower Decl. II at ¶¶ 7–9); that such inspections were always conducted after they had clocked out or were already on their breaks (see id.); and that they were not compensated for the time waiting for and undergoing the inspections. (See Medina Decl. at ¶¶ 6–8; Ocampo Decl. at ¶¶ 6–7; Taff Decl. at ¶¶ 6–7; Khremian Decl. at ¶¶ 6–8; Barzotti Decl. at ¶ 4; Mower Decl. II at ¶¶ 7–9).

Some declarants describe wait times as long as 20–30 minutes. For example, plaintiff states that "[e]ach time [she] left Ulta Salon, whether for break, lunch, or at the end of [her] shift, [she] spent 5–20 minutes off the clock waiting to be searched and being searched prior to being able to leave." (Moore Decl. at ¶ 5). With respect to her 30–minute meal break, Esteffania Ocampo states that "[o]n occasion, [she] waited as long as 30 minutes for a manager to come to the front of the store while [she] was clocked out." (Ocampo Decl. at ¶ 6). Richard Medina also states that he was given a 30–minute lunch break, but "[a]fter clocking out, waiting for the exit inspection to be completed took up to 20 minutes." (Medina Decl. at ¶ 6). The same wait times existed for the end-of-

10. The Declaration of Elise Perrow Concerning Defendant's Wage, Hour, and Meal Break Policies (see Wilson Decl., Exh. 25) was withdrawn by plaintiff. (See Notice of Withdrawal of Exhibit 25, the Declaration of Elise Perrow, Submitted in Support of Plaintiff's Motion for Certification). Accordingly, the court will not consider it.

11. Mower previously provided defendant with a declaration. Accordingly, the Mower declaration submitted by plaintiff will be referred to as "Mower Decl. II." However, Mower's first declaration directly contradicts some of the statements in her second declaration. (Compare Appx. of Evid., Exh. 37 (Declaration of Christina Mower ("Mower Decl. I") at ¶¶ 4–6 with Mower Decl. II at ¶¶ 6–9). Accordingly, the court gives both Mower declarations substantially less weight than others submitted by the parties.

shift and meal and rest break exit inspections. (*See id.* at ¶¶ 7–8). Joyce Khremian describes her typical wait time as 10–15 minutes, but on occasion, she "waited as long as 20 minutes for a manager to come to the front of the store while [she] was off the clock" for lunch or the end of her shift. (Khremian Decl. at ¶¶ 6–7). Plaintiff concedes that "the exit inspection itself takes about two minutes or less to complete," (*see* Motion at 7), but asserts that there can be considerable delay in getting a manager to the front of the store to conduct the inspection. (*See id.*). She estimates that the wait time for an exit inspection takes between seven and 30 minutes.[12] (*See id.*).

Plaintiff also presented evidence that Ulta knows and intends that exit inspections occur after employees have clocked out. A "Key Corporate Communication" from August 2010 lists "Best Practices for Managing Punch Policy Compliance." (*See* Wilson Supp. Decl., Exh. 30 ("Key Corporate Communication") at D542; *see also* Archer Depo. I at 158 (a "key corporate communication . . . generally would have gone out to all stores"). It states that stores should "follow these simple steps" to ensure that the store's "team is punching properly[:]" "*As you are performing an exit inspection:* 'Did you

punch out for your shift?'" (Key Corporate Communication at D542 (emphasis in original)). It further states: "*At the end of the night:* Gather the team in the back room and punch out together to ensure each closing associate has punched out correctly. After everyone has punched out, proceed to the front door, complete Exit Inspections in an expeditious manner and leave for the night." (*Id.*) (emphasis in original). The end of the document states, "remember to perform Exit Inspections in an expeditious manner; employees should not have to wait to be checked out at the end of their shift, or as they leave for lunch breaks." (*Id.*).

### 2. Defendant's Contentions.

Although Ulta does not dispute that it requires exit inspections before employees leave the store for any purpose and that some inspections occur off the clock, it disagrees with plaintiff's contention that Ulta has a uniform policy requiring that exit inspections be conducted off the clock. (*See* Opp. at 4–5). Accordingly, it argues that its exit inspection policies are carried out with considerable variation at the store level.[13] (*See id.* at 5–12).

Rather than setting out a sequence of events, Ulta contends that the End of Shift

---

12. In 2012, Ulta implemented a new timekeeping system whereby employees could clock out at the cash registers. (*See* Archer Depo. I at 52, 77, 101; Moore Depo. I at 71, 152). Plaintiff, however, contends that Ulta employees are still required to "undergo long off-the-clock wait times because they are still required to clock out before waiting for a manager to conduct the inspection." (*See* Motion at 8, citing Moore Depo. I at 73, 152–155, 169; Ocampo Decl.; Mower Decl. II).

13. Ulta provides a large appendix of evidence, including 37 declarations, in support of its arguments. Of the 37 declarations, one is from defense attorney Kai–Ching Cha, and another from Ulta Director of Human Resources Anita Ryan. (*See* Appx. of Evid. at 1–2). The remaining 35 are by Ulta employees at the store level, 27 of whom are General Managers. (*See id.*). General Managers are exempt employees and are therefore not part of the putative class. (*See* Ryan Decl. at ¶ 3). This means that of the 37 declarations submitted by defendant, only eight are from class members, one of whom, Christina Mower, provided a contradictory declaration. *See supra* at note 11.

Although defendant's Voluntary Interview Consent Form ("Consent Form") was attached to the declarations, there is nothing to suggest (and Ulta does not contend) that the declarations from the eight class members were randomly selected or otherwise constitute a representative sample of employees. (*See, e.g.*, Appx. of Evid., Exh. 1 (Declaration of Victoria Alvarez) ("Alvarez Decl."), Consent Form) (stating that Ulta is "interviewing a cross-section of non-exempt employees[,]" but only including eight such declarations in its appendix). Moreover, despite the Consent Form's admonition that employees interviewed "may be eligible to join this lawsuit and, if the lawsuit is successful, collect money" (*see, e.g.*, Alvarez Decl., Consent Form), the General Managers may have understood full well that they are not eligible to join the lawsuit.

Further, as the court mentioned previously, the identities of the individuals interviewed were not provided to plaintiff. *See supra* at note 2. Given that plaintiff was limited to employees from the Pasadena and Glendora stores based on defendant's resistance to discovery, *see infra* at § I.D., the parties arguably would be on equal evidentiary footing if defendant were similarly limited. Nevertheless, the court will consider all of defendant's evidence.

Routine described in the New Hire Orientation manual is "merely a list of tasks an employee should perform at the end of his [or] her shift; it is not a policy dictating bag checks must occur off the clock." (*See* Opp. at 4, citing Cha Decl., Exh. A (excerpts of Deposition of Dominick Archer) ("Archer Depo. II") at 19, 30–31, 125–130; 2012 Associate Handbook and New Hire Orientation manual at 3–4 [14]; Cha Decl., Exh. H (Declaration of Dominick Archer) at ¶ 7 ("With respect to the steps involved in the End of Shift Routine, the order of events on page 4 is a guideline. It is not an Ulta policy. For example, if an employee was to clock out and have their bag inspected at the cash [register], they could have their bag inspected before clocking out.")). According to Ulta, the End of Shift Routine in the New Hire Orientation manual does not set forth a comprehensive set of Ulta policies; it specifically advises employees that the "associate handbook provides [employees] with a comprehensive guide to our associate policies and procedures." (*See* Ryan Decl., Exh. E ("2012 New Hire Orientation manual") at 7; *see also id.* Exh. F ("2011 New Hire Orientation manual") at 6; Exh. G ("2010 New Hire Orientation manual") at 6). Ulta also contends that store General Managers consider the New Hire Orientation manual to be a "tool or guideline" to assist them during new hire orientation. (*See* Opp. at 4, citing Alvarez Decl. at ¶ 6 ("I do not consider [the New Hire Orientation manual] to reflect company policy. Rather, it is a reference tool to cover different topics with an employee.")); Appx.

of Evid., Exh. 18 (Declaration of Catherine Meikel ("Meikel Decl.") at ¶ 13 (stating that New Orientation document "does not reflect Ulta's policy[ ]" but is a "guideline for managers")).[15]

Moreover, Ulta claims that its General Managers do not require, or do not understand Ulta's policies to require, exit inspections to occur off the clock. (*See* Opp. at 4; Appx. of Evid., Exh. 3 (Declaration of Kysha Beach ("Beach Decl.") at ¶ 18 (informs new employees that they should "have their bags checked before they clock out"); Appx. of Evid., Exh. 4 (Declaration of Leelah Her Carrera ("Carrera Decl.") at ¶ 21 ("Ulta does not require employees to clock out before getting their bags checked."); Appx. of Evid., Exh. 6 (Declaration of Michael Fisher ("Fisher Decl.") at ¶ 16 (same); Meikel Decl. at ¶ 21 (same); Appx. of Evid., Exh. 10 (Declaration of Chris Jarboe ("Jarboe Decl.") at ¶ 16 (same); Appx. of Evid., Exh. 20 (Declaration of Margarita Ortiz ("Ortiz Decl.") at ¶ 17 ("It is not against Ulta policy for employees to have their bags checked and to then clock out at the front register."); Appx. of Evid., Exh. 15 (Declaration of Susie Martin ("Martin Decl.") at ¶ 20 ("It makes no difference if they have their bags checked before or after they clock out, as long as they have their bags checked."); Appx. of Evid., Exh. 9 (Declaration of Janette Jacobs ("Jacobs Decl.") at ¶¶ 16–17 ("Ulta does not require employees to clock out before getting their bags checked[,]" but most employees do); Appx. of Evid., Exh. 31 (Declaration of

14. The exhibit cited by defendant, Exhibit 1 to the Archer deposition, appears to be the 2012 version of the Employee Handbook/New Hire Orientation manual, rather than Exhibit 3 to which the cited testimony refers but which was not attached. (*See* Archer Depo. II at 127). Because Archer acknowledged that the 2011 and 2012 versions contained the same language regarding the End of Shift Routine, (*see id.* at 129), the court will reference Exhibit 1, the 2012 version, as well as the 2011 version submitted by plaintiff (Exh. 2) and Ulta. (*See* Ryan Decl., Exhs. E–F).

15. Plaintiff asserts that "Defendant flagrantly dismisses the New Hire Orientation booklet as optional policy, while declaring the Employee Handbook is widely distributed. This is an impossibility as these handbooks are one and the same." (Reply at 1). The court has reviewed

the physical copy of the handbook and notes that there is one booklet with two sections. (*See* Notice of Lodging). One is entitled "Employee Handbook," and the other has a back cover that becomes a second front cover when turned upside down. (*See id.*). The second front cover is entitled "New Hire Orientation." (*See id.; see also supra* at note 4). An employee in receipt of this booklet would have both the "New Hire Orientation" and the "Employee Handbook" sections. Thus, it is true, as plaintiff asserts, that defendant's counsel has "misrepresent[ed] the nature of [defendant's] own handbook[.]" (*See* Reply at 1). In any event, although it strikes the court as implausible that one side of the handbook can be a "tool or guideline" (*see* Opp. at 4), while the other is a set of mandatory policies, this is a question of fact that has yet to be resolved.

Vicki Slingerland ("Slingerland Decl.") at ¶ 20 (no policy barring on-the-clock bag checks); Appx. of Evid., Exh. 22 (Declaration of Joanne Osborne ("Osborne Decl.") at ¶ 18 ("Ulta does not require employees to clock out before getting their bags checked."); Appx. of Evid., Exh. 23 (Declaration of Deann Plotkin ("Plotkin Decl.") at ¶ 19 (same). Nor, according to Ulta, are employees instructed that exit inspections should be performed after they clock out. (*See* Opp. at 4–5; *see, e.g.,* Plotkin Decl. at ¶ 19 ("I have never instructed [employees] that they must clock out prior to getting their bags checked."); Fisher Decl. at ¶ 16 (same); Jacobs Decl. at ¶ 16 (same); Martin Decl. at ¶ 19 (same); Meikel Decl. at ¶ 21 (same); Osborne Decl. at ¶ 18 (same); Slingerland Decl. at ¶ 18 (same); Appx. of Evid., Exh. 33 (Declaration of Johnny Tran ("Tran Decl.") at ¶ 18 (same); Carrera at ¶ 21 ("I do not instruct [employees] that they must clock out prior to getting their bags checked."); Jarboe Decl. at ¶ 16 (same)).

Ulta points to the variances in the manner that such inspections are conducted at different store locations throughout California as evidence that Ulta does not have a uniform policy of requiring off-the-clock exit inspections. (*See* Opp. at 5–7). It asserts that whether an exit inspection is conducted on or off the clock depends on the General Manager of each store. (*See id.* at 5–6). Some General Managers conduct the inspections while the employees are still clocked in (*see, e.g.,* Beach Decl. at ¶ 18 (informs new employees that they should "have their bags checked before they clock out"); Appx. of Evid., Exh. 35 (Declaration of Rachel Wendt ("Wendt Decl.") at ¶¶ 14 & 21 (instructs employees to inform manager of the need for an exit inspection while employee is still on the clock), while others permit employees to make the decision. (*See, e.g.,* Slingerland Decl. at ¶ 20 (believes 60% of employees who have exit inspection after clocking out do so "because the bag check process is really quick"); Plotkin Decl. at ¶ 19 ("I do not specify whether they need to clock out before or after a bag check. It is not against Ulta's policy for employees to have their bags

checked and to then clock out[.]"); Carrera Decl. at ¶ 22 (most employees clock out before having their bags checked); Jacobs Decl. at ¶ 17 (same); Appx. of Evid., Exh. 13 (Declaration of Keith Andrew Karmody ("Karmody Decl.") at ¶ 19 (same)).

Ulta also points out that the time plaintiff and her supporting declarants spent waiting for an exit inspection varied considerably. (*See* Opp. at 7–8). Moreover, according to defendant the average time it takes to conduct an exit inspection—from the time an employee clocks out until completion of the inspection—is minimal. (*See id.* at 9–10; *see, e.g.,* Alvarez Decl. at ¶ 18 (closing shift bag check typically "takes less than 2 minutes"); Appx. of Evid., Exh. 8 (Declaration of Julie Hofacre ("Hofacre Decl.")) at ¶ 17 (closing shift "process takes approximately one minute"); Karmody Decl. at ¶ 20 (closing shift process, including exit inspection, "takes no more than 30 seconds"); Meikel Decl. at ¶ 23 (closing shift "process takes a minute or less"). Ulta asserts that all of this evidence establishes that the written policies discussed above, *see supra* at § B.1., are not a reliable indicator of the realities of employee inspections, which vary considerably from store to store.

### *LEGAL STANDARD*

This court has "broad discretion to determine whether a class should be certified, and to revisit that certification throughout the legal proceedings before the court." *Armstrong v. Davis,* 275 F.3d 849, 871 n. 28 (9th Cir.2001), *cert. denied,* 537 U.S. 812, 123 S.Ct. 72, 154 L.Ed.2d 14 (2002), *abrogated on other grounds by Johnson v. California,* 543 U.S. 499, 125 S.Ct. 1141, 160 L.Ed.2d 949 (2005). The court need only form a "reasonable judgment" on each certification requirement "[b]ecause the early resolution of the class certification question requires some degree of speculation[.]" *Gable v. Land Rover N. Am., Inc.,* 2011 WL 3563097, *3 (C.D.Cal. 2011) (internal quotation marks omitted).

Rule [16] 23 permits a plaintiff to sue as a representative of a class if:

---

**16.** All "Rule" references in this order are to the Federal Rules of Civil Procedure.

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions or law or fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

■ Fed.R.Civ.P. 23(a). Courts refer to these requirements by the following shorthand: "numerosity, commonality, typicality and adequacy of representation[.]" *Mazza v. American Honda Motor Co. Inc.*, 666 F.3d 581, 588 (9th Cir.2012).

In addition to fulfilling the four prongs of Rule 23(a), the proposed class must also meet at least one of the three requirements listed in Rule 23(b). *See Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 131 S.Ct. 2541, 2548, 180 L.Ed.2d 374 (2011). Here, plaintiff seeks class certification under Rule 23(b)(3), which requires the court to find "that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

■ Rule 23 requires the party seeking class certification to "affirmatively demonstrate ... compliance with the Rule[.]" *Dukes*, 131 S.Ct. at 2551. A court must conduct a "rigorous" class certification analysis. *Id.* (internal quotation marks omitted). On occasion, this analysis "will entail some overlap with the merits of the plaintiff's underlying claim[,]" and "sometimes it may be necessary for the court to probe behind the pleadings[.]" *Id.* (internal quotation marks omitted). However, courts must remember that "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Amgen Inc. v. Connecticut Ret. Plans & Trust Funds*, —— U.S. ——, 133 S.Ct. 1184, 1194–95, 185 L.Ed.2d 308 (2013) ("Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites ... are satis-

fied."); *see Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n. 8 (9th Cir.2011) (the district court may examine the merits of the underlying claim "only inasmuch as it must determine whether common questions exist; not to determine whether class members could actually prevail on the merits of their claims. To hold otherwise would turn class certification into a mini-trial.") (citations omitted).

### *DISCUSSION*

■ On a motion for class certification, "evidentiary rules unrelated to expert testimony are not applied with rigor" because the court does not make findings of fact or ultimate conclusions on plaintiff's claims. *See Cholakyan v. Mercedes–Benz, USA, LLC*, 281 F.R.D. 534, 550 (C.D.Cal.2012); *see also Arredondo v. Delano Farms Co.*, 301 F.R.D. 493, 504 (E.D.Cal.2014) ("[W]hile the Court shall discuss in detail ... [the] presentation of conflicting evidence, the analysis of the evidence is merely to determine issues related to certification."). Accordingly, the court may consider evidence that may not be admissible at trial on a motion for class certification. *See Gonzalez v. Millard Mall Services, Inc.*, 281 F.R.D. 455, 459 (S.D.Cal. 2012). The court addresses the parties' objections to evidence below to the extent it deems necessary but does not address objections pertaining to facts it did not consider or that are irrelevant to the resolution of the Motion.

### I. RULE 23(a) REQUIREMENTS.

#### A. *Numerosity.*

■ A putative class may be certified only if it "is so numerous that joinder of all members is impracticable[.]" Fed.R.Civ.P. 23(a)(1). Although impracticability does not hinge only on the number of members in the putative class, joinder is usually impracticable if a class is "large in numbers[.]" *See Jordan v. County of Los Angeles*, 669 F.2d 1311, 1319 (9th Cir.), *vacated on other grounds*, 459 U.S. 810, 103 S.Ct. 35, 74 L.Ed.2d 48 (1982) (class sizes of 39, 64, and 71 are sufficient to satisfy the numerosity requirement). "As a general matter, courts

have found that numerosity is satisfied when class size exceeds 40 members[.]" *Slaven v. BP America, Inc.*, 190 F.R.D. 649, 654 (C.D.Cal.2000); *see Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 473–74 (C.D.Cal.2012).

██ Ulta does not challenge plaintiff's contention that the proposed class is comprised of approximately 8,250[17] employees. (*See* Motion at 13). Because there are well over 40 putative class members, the numerosity requirement is readily satisfied.

### B. Commonality.

██ The commonality requirement is satisfied if "there are common questions of law or fact common to the class[.]" Fed. R.Civ.P. 23(a)(2). Commonality requires plaintiff to demonstrate that her claims "depend upon a common contention ... [whose] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S.Ct. at 2551; *see also Wolin v. Jaguar Land Rover North America, LLC*, 617 F.3d 1168, 1172 (9th Cir.2010) (The commonality requirement demands that "class members' situations share a common issue of law or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief.") (internal quotation marks omitted). "The plaintiff must demonstrate the capacity of classwide proceedings to generate common answers to common questions of law or fact that are apt to drive the resolution of the litigation." *Mazza*, 666 F.3d at 588 (internal quotation marks omitted). "This does not, however, mean that every question of law or fact must be common to the class; all that Rule 23(a)(2) requires is a single significant question of law or fact." *Abdullah v. U.S. Security Associates, Inc.* 731 F.3d 952, 957 (9th Cir.2013), *cert. denied*, —— U.S. ——, 135 S.Ct. 53, 190 L.Ed.2d 30 (2014) (emphasis and internal quotation marks omitted); *see Mazza*, 666 F.3d at 589 (characterizing commonality as a "limited burden[,]" stating that

it "only requires a single significant question of law or fact[,]" and concluding that it remains a distinct inquiry from the predominance issues raised under Rule 23(b)(3)). Proof of commonality under Rule 23(a) is "less rigorous" than the related preponderance standard under Rule 23(b)(3). *See Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019–20 (9th Cir.1998); *Mazza*, 666 F.3d at 589. "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Hanlon*, 150 F.3d at 1019.

██ This case presents common questions of law and fact, the answers to which will "drive the resolution" of the claims of the putative class. Ulta's manuals and handbooks require employees to (a) use clear bags when bringing personal items into the store; (b) lock those items in lockers while they are working; and (c) undergo exit inspections before they exit the store. (*See, e.g.*, 2011 Employee Handbook at D221; analogous provision in 2012 Associate Handbook at 22). Ulta also requires its employees to record how much they work each day. (*See, e.g.*, People Manual at D111). Although Ulta has a policy against off-the-clock work (*see id.*), it has no policy or procedure stating that any of the bag check activities are (or are not) work for which nonexempt employees should be paid. (*See, generally*, 2011 Employee Handbook; 2012 Associate Handbook; People Manual). These underlying facts raise questions that include, but are not limited to: (1) whether Ulta's policy required exit inspections off the clock; (2) if not, whether the policy permits inspections off the clock; (3) whether the time spent waiting for and/or undergoing inspections is labor within the meaning of the California Labor Code; (4) if so, whether such work should be compensated; and (5) whether Ulta knew or had reason to know that its employees were performing uncompensated work.

---

**17.** In February 2013, defendant noted, and did not challenge, plaintiff's estimate that the class included approximately 3,500 individuals. (*See* Joint Stipulation Re: Plaintiff's Motion to Compel Further Responses to Request for Production Propounding Upon Defendant at 3; Defendant's

Supplemental Memorandum in Opposition to Motion to Compel Responses From Defendant at 2). Regardless of whether the class contains over 3,000 or over 8,000 putative members, the putative class satisfies the numerosity standard in Rule 23(a)(1).

Ulta argues that even if bag checks occurred off the clock, the time spent waiting for and undergoing exit inspections is *de minimis* and not compensable. (*See* Opp. at 19). This raises additional common questions, the most important of which is whether defendant has waived the right to assert that defense.[18] Further, even assuming that defendant has not waived the *de minimis* defense, evaluating it will require answering a number of common questions. *See, e.g., Rai v. Santa Clara Valley Transportation Authority*, 308 F.R.D. 245, 259 (N.D.Cal.2015) (finding that defendant's "defense that Plaintiffs engaged only in *de minimis* activities for which they are not entitled to compensation does not preclude class treatment because analysis of this defense requires resolution of a common issue of law, not an individualized inquiry into each [putative class member's] activities.") (internal quotation marks omitted); *see also infra* at § II.B., for further discussion of the elements of a *de minimis* defense.

The common questions listed in the preceding paragraphs are susceptible to common proof—that is, testimony by plaintiff and her expert(s) explaining whether off-the-clock inspections are required and/or permitted, how much time employees spend waiting for and undergoing bag checks, as well as documents explicating Ulta's policies and practices regarding inspections and employee timekeeping—the "truth or falsity" of which "will resolve an issue that is central to the [claims'] validity[.]" *See Dukes*, 131 S.Ct. at 2551. Because the claims of all prospective class members involve the same alleged policies and practices, they are susceptible to common proof sufficient to meet the commonality requirement of Rule 23(a)(2). *See, e.g., Stiller v. Costco Wholesale Corp.*, 298 F.R.D. 611, 625 (S.D.Cal.2014) ("The Court finds the questions of whether the Alleged Policy existed, was enforced on a company-wide basis, and resulted in Costco's control over employees satisfy the commonality requirement."); *Hall v. Best Buy Co., Inc.*, 274 F.R.D. 154, 165 (E.D.Pa.2011) ("Commonality is . . . satisfied because a question of law and fact is common to each class member: whether Best Buy had a uniform practice of refusing to pay for off-the-clock work that violated state wage and hour laws."); *Cervantez v. Celestica Corp.*, 253 F.R.D. 562, 572 (C.D.Cal.2008) (finding that the "question of law common to all members of the security line class [was] whether time spent in the security line at the end of a shift is compensable under the California Labor Code").

Ulta asserts that plaintiff has ignored the *Dukes* standard for establishing commonality, which requires more than just asking the common question of whether the putative class members "have all suffered a violation of the same provision of law." (*See* Opp. at 16) (quoting *Dukes*, 131 S.Ct. at 2551) (emphasis omitted). Defendant's argument is unavailing. While certain of the common questions that plaintiff listed may restate her claim that the law was violated (*i.e.*, "[d]oes Ulta's standard policy of not compensating non-exempt employees for time spent waiting for completion of the exit inspection process . . . violate Labor Code §§ 200 *et seq.*"), the questions described in the preceding paragraphs go to the contentions at the heart of plaintiff's claims and meet the *Dukes* requirement that the claims "depend upon a common contention . . . [that is] of such a nature that it is capable of classwide resolution[.]" *See Dukes*, 131 S.Ct. at 2551. Indeed, defendant's own statement in support of its argument against commonality that "Ulta has no policy requiring off the clock bag checks[,]" (Opp. at 17), raises a common question. The factual issue of whether Ulta policies actually require—or are interpreted

---

**18.** Courts treat the *de minimis* defense "as an affirmative defense or have not objected" to the parties' characterization as such. *See Waine-Golston v. Time Warner Entertainment–Advance/New House Partnership*, 2013 WL 1285535, *5 (S.D.Cal.2013); *see also Minns v. Advanced Clinical Employment Staffing LLC*, 2014 WL 5826984, *3 (N.D.Cal.2014) (granting a motion to strike the *de minimis* affirmative defense); *Willner v. Manpower, Inc.*, 2012 WL 4902994, *1 (N.D.Cal.2012); *Figueroa v. Islands Rests. L.P.*, 2012 WL 2373249, *3–4 (C.D.Cal.2012). If it is an affirmative defense, Rule 8 requires a party to raise the *de minimis* argument in a responsive pleading. *See* Fed.R.Civ.P. 8(c)(1). The court has reviewed defendant's answer, and it does not appear to have been raised. (*See, generally*, Defendant Ulta Salon, Cosmetics & Fragrance, Inc's Answer to First Amended Complaint).

to require—off the clock bag checks is one that is common to the class as a whole, and it is capable of resolution by common proof.[19]

### C. *Typicality.*

Typicality requires a showing that "the claims or defenses of the representative parties are typical of the claims or defenses of the class[.]" Fed.R.Civ.P. 23(a)(3). The purpose of this requirement "is to assure that the interest of the named representative aligns with the interests of the class." *Wolin*, 617 F.3d at 1175 (internal quotation marks omitted). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Id.* (internal quotation marks omitted). Courts usually consider representative claims typical if "they are reasonably co-extensive with those of absent class members[, but] they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. In other words, plaintiff must "bridge the gap between [her] own claims as an individual and existence of a class of persons who have suffered the same injury ... by demonstrating that the experience of being a[n hourly Ulta] employee has more than a tenuous connection to being injured in a legally cognizable manner." *Kurihara v. Best Buy Co., Inc.*, 2007 WL 2501698, *6 (N.D.Cal.2007) (internal quotation marks omitted).

Here, plaintiff's claims are typical of those of the putative class members because all hourly Ulta employees, regardless of title, were subject to the same exit inspection procedures. (*See* 2011 Employee Handbook at D221 ("All employees are required to have package/purse/pocket inspections ... anytime they exit the store"). Plaintiff, like other class members, allegedly was denied sufficient compensation as a result of these exit inspection policies and practices. (*See* Motion at 2). Defendant points to a number of purported defects in the typicality of plaintiff's claims. (*See, e.g.,* Opp. at 19) (referring to the "atypical bag" that plaintiff used; asserting that plaintiff waited longer than other employees and that others were inspected for a non-compensable *de minimis* amount of time). These arguments, however, are best directed toward the Rule 23(b)(3) inquiry as to whether common questions predominate over individualized issues. For purposes of the typicality requirement, it is sufficient that plaintiff has asserted that all putative class members are subject to the exit inspection policies. *See Kurihara*, 2007 WL 2501698, at *7 ("[I]t is sufficient that plaintiff, a former Best Buy employee, has asserted that all Best Buy employees are subject to the challenged practice and procedure."). She has therefore satisfied the typicality requirement.

### D. *Adequacy of Representation.*

Rule 23(a)(4) permits certification of a class action if "the representative parties will fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). The Ninth Circuit uses a two-prong test to determine adequate representation: "(1) do the named plaintiff[ ] and [her] counsel have any conflicts of interest with other class members and (2) will the named plaintiff[ ] and [her] counsel prosecute the action vigorously on behalf of the class?" *Ellis*, 657 F.3d at 985 (internal quotation marks omitted). "Adequate representation depends on, among other factors, an absence of antagonism between representatives and absentees, and a sharing of interest between representatives and absentees." *Id.* The adequacy of counsel

---

**19.** Defendant also appears to argue that plaintiff's failure to provide answers to common questions means that the putative class does not meet the *Dukes* commonality requirement. (*See* Opp. at 1–2) ("[m]erely raising unanswered common questions, as Plaintiff does, dos not satisfy *Dukes*")). Defendant misstates the *Dukes* standard, which requires plaintiff to show that classwide proceedings will "generate common answers" to the questions. *See Dukes*, 131 S.Ct. at 2551 (internal quotation marks and emphasis omitted). Plaintiff need not provide answers to the common questions at this stage, neither under Rule 23(a)'s commonality standard nor under 23(b)(3)'s predominance standard. *See id.; Amgen*, 133 S.Ct. at 1191 ("Rule 23(b)(3) requires [only] a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.") (emphasis omitted).

is also considered under Rule 23(g). *See* Fed.R.Civ.P. 23(g).

■ Moore asserts that she will adequately represent the proposed class. (*See* Motion at 17). She states that she has suffered the same labor code violations as the class and sought legal counsel as a result. (*See id.*). She has been involved in prosecuting this case since its inception. (*See id.*). She further contends that her interests align with those of the class because she seeks to redress Ulta's policies of "undercompensating them all and has no conflicts with other [c]lass members." (*Id.*). Finally, plaintiff contends that she has retained competent counsel to represent her and the class. (*See id.*).

Ulta asserts that plaintiff is an inadequate representative, as there is a conflict of interest among the proposed class because it includes supervisors and managers who conducted the allegedly unlawful off-the-clock exit inspections. (*See* Opp. at 20–21). The proposed class consists of all hourly employees, which includes all store employees other than the General Manager, such as Co–Managers, Associate Managers, Merchandise Service Coordinators, and Key Holders. (*See, e.g.,* Ryan Decl. at ¶ 3). Defendant's assertions are unpersuasive.

There is no *per se* rule that the presence of supervisory and nonsupervisory employees in a proposed class creates a conflict of interest. *See Staton v. Boeing Co.,* 327 F.3d 938, 958 (9th Cir.2003) ("Th[e] concern about classes that involve both supervisors and rank-and-file workers can be a valid one in some circumstances[,]" but there is no "per se rule concerning adequacy of representation where the class includes employees at different levels of an employment hierarchy."). Instead, the inquiry is "context-specific and depends upon the particular claims alleged in a case." *Id.*

Here, plaintiff does not allege that Ulta treated her any differently than it treated the supervisors or managers; in fact, she specifically states that all are subject to the same exit inspection policy.[20] (*See* Motion at 2) ("This policy is standard throughout every Ulta store in California and applies consistently to every non-exempt employee."). Therefore, even though supervisors typically conducted the checks, the claim that the policy required or encouraged all non-exempt hourly employees to work without compensation suggests that both supervisors and their subordinates were affected similarly. Moreover, as defendant recognizes, "all employees on the closing shift check each other's bags or their closing manager's bag." (Opp. at 21). The putative class, then, is comprised of non-exempt employees who were all subject to a policy that caused them to undergo *and* perform exit inspections. *See Pena,* 305 F.R.D. at 215 (finding there was no conflict and certifying a class that included employees and supervisors). If successful, all of the employees, regardless of position, will be owed compensation as a result. In short, the court finds that there is no conflict of interest among different types of nonexempt Ulta employees.

■ Adequate representation relates not only to the proposed plaintiff, but also to plaintiff's counsel. *See Hanlon,* 150 F.3d at 1020 ("will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?") (citing *Lerwill v. Inflight Motion Pictures, Inc.,* 582 F.2d 507, 512 (9th Cir.1978) (the representatives must be able to prosecute the action "vigorously through qualified counsel"). Under Rule 23(g), courts must consider the work counsel has done in identifying and investigating the claims in the action, counsel's experience in handling class actions, counsel's knowledge of the applicable law, and the resources counsel will commit to representing the class. *See* Fed.R.Civ.P. 23(g).

20. This case is distinguishable from other cases, *see, e.g., Hadjavi v. CVS Pharmacy, Inc.,* 2011 WL 3240763, *6 (C.D.Cal.2011) (finding conflict between plaintiff and manager class members because one plaintiff stated that he felt "tremendous pressure" from managers to work during his breaks), that have found conflicts between employees and supervisors because plaintiff does not assert that direction to work off the clock came from the supervisors themselves. *See Pena v. Taylor Farms Pacific, Inc.,* 305 F.R.D. 197, 215 (E.D.Cal.2015) (finding there was no conflict and distinguishing other cases on the basis that plaintiffs did not assign liability for labor law violations to their supervisors).

Here, plaintiff asserts that her counsel are "competent and seasoned[,] ... with adequate financial resources to adequately represent her interests." (*See* Motion at 17). The attorneys involved have substantial trial experience and experience in class action and wage and hour litigation. (*See* Wilson Decl. at ¶ 6; Declaration of Alejandro D. Blanco, Esq. in Support of Motion for Class Certification at ¶ 2; Declaration of Kristin Hobbs, Esq. in Support of Motion for Class Certification ("Hobbs Decl.") at ¶ 8). Counsel states that they have put together a litigation team that includes "economists, private investigators, information technologists, and experienced legal assistants[,]" all of whom have devoted, and will continue to devote, time and resources to this case. (*See* Hobbs Decl. at ¶ 9).

Defendant asserts that "counsel has done little to investigate the claims in this action – while they seek to certify a class of over 8,000 members, their motion is supported by 6 declarations covering 3 stores in one county. The motion offers no expert testimony, a trial plan or any method of common proof. It demonstrates little knowledge of the applicable law, ignores all relevant Supreme Court and Ninth Circuit Precedent decided after 2008 and wholly misstates the standards for certification." (Opp. at 25). Defendant's assertions are, at best, disingenuous and a mischaracterization of the proceedings in this case. The court has already addressed defense counsel's misstatement of the *Dukes* standard for commonality under Rule 23(a)(2), *see supra* at § I.B., and will discuss below defendant's failure to address applicable Ninth Circuit precedent in its discussion of *Comcast Corp. v. Behrend*, —— U.S. ——, 133 S.Ct. 1426, 185 L.Ed.2d 515 (2013). *See infra* at § II.B.2.[21] With respect to the number of Supporting Declarations and the stores they cover, defendant surely recalls that plaintiff sought to identify putative class members during the discovery process. (*See* Wilson

Decl., Exh. 14 (Defendant Ulta Salon, Cosmetics & Fragrance, Inc.'s Response to Plaintiff's Special Interrogatories, Set No. One) at 7). Defendant, however, objected on a number of grounds to the requested discovery, stating, for example, that plaintiff's interrogatory "seeks to elicit information that is beyond the scope of issues pertaining to class certification." (*See id.* at 8). When plaintiff moved to compel the production of documents related to identifying defendant's California hourly employees during the relevant period, (*see* Joint Stipulation Re: Plaintiff's Motion to Compel Further Responses to Request for Production Propounding [sic] Upon Defendant ("Motion to Compel") at 2), defendant responded that plaintiff should not be allowed "to engage in class-wide merits discovery because discovery is limited to those issues necessary to establish class certification." (*See id.* at 4–5). The Magistrate Judge limited the discovery plaintiff could receive, requiring defendant to provide responsive discovery only as to its Glendora and Pasadena stores. (*See* Court's Order of March 26, 2013, at 4). Of course, had plaintiff been successful in obtaining the requested discovery, plaintiff's counsel may have been able to obtain additional declarations. Thus, defendant's assertion that plaintiff's counsel is inadequate because of their inability to obtain the very information defense counsel refused to produce—because it was supposedly irrelevant to class certification—is utterly meritless, disingenuous, and not well-taken.

In any event, plaintiff has demonstrated that her counsel will represent the proposed class adequately. Plaintiff's attorneys have identified and investigated the claims in this action to the best of their ability—even though their discovery requests were arguably improperly limited—and have demonstrated sufficient knowledge of the applicable law.

---

21. The court also notes defendant's mischaracterization of plaintiff's bag as "large, black-tinted, semi-opaque, [and] ... crammed full of clothes and other personal items" (Opp. at 19), when the transcript of plaintiff's deposition reflects defense counsel, Mr. Kloosterman, stating that the bag is "clear in the middle parts" and "not clear on the ends[,]" and plaintiff told him that Ulta approved her use of that bag. (*See* Moore Depo. II at 61, 62). Far from stating that it was "crammed full" of anything, plaintiff stated that she brought her "[w]allet, keys, phone, identification, make-up, [and] sometimes clothing." (*See id.* at 132).

## II. RULE 23(b) REQUIREMENTS.

■ Certification under Rule 23(b)(3) is proper "whenever the actual interests of the parties can be served best by settling their differences in a single action." *Hanlon,* 150 F.3d at 1022 (internal quotation marks omitted). Rule 23(b)(3) requires two different inquiries, specifically a determination as to whether: (1) "questions of law or fact common to class members predominate over any questions affecting only individual members[;]" and (2) "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R.Civ.P. 23(b)(3). A court evaluating predominance and superiority must consider: (1) "the class members' interests in individually controlling the prosecution or defense of separate actions;" (2) "the extent and nature of any litigation concerning the controversy already begun by or against class members;" (3) "the desirability or undesirability of concentrating the litigation of the claims in the particular forum;" and (4) "the likely difficulties in managing a class action." *Id.*

### A. *Class Definition.*

Before analyzing the Rule 23(b) requirements, the court addresses defendant's argument that the proposed class is not ascertainable. (*See* Opp. at 20–21). Although it is not entirely clear, it appears that defendant's argument is made on the basis that there are conflicts of interest within the class. (*See id.*). While conflicts of interest are more properly analyzed under Rule 24(a)(4)'s adequacy of representation inquiry, *see Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625, 117 S.Ct. 2231, 2250, 138 L.Ed.2d 689 (1997) ("[t]he adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent"); *see also supra* at § I.D., defendant asserts that "[a]n implied prerequisite for class certification is that the class must be sufficiently definite[, and that] Plaintiff must demonstrate that an identifiable and ascertainable class exists." (Opp. at 21).

Defendant has not cited, nor is the court able to locate, a case in which the Ninth Circuit has stated that ascertainability is a "prerequisite" (*see* Opp. at 21), implied or otherwise, for class certification. (*See, generally,* Opp.). In a recent case, the Ninth Circuit affirmed a district court's denial of class certification because "there was no reasonably efficient way to determine" which of the potential class members were harmed by defendant's conduct, and therefore a class action was not a superior method of adjudication under Rule 23(b)(3). *See Martin v. Pacific Parking Systems, Inc.,* 583 Fed.Appx. 803, 804 (9th Cir.2014), *cert. denied,* ── U.S. ──, 135 S.Ct. 962, 190 L.Ed.2d 833 (2015); *see also Pierce v. County of Orange,* 526 F.3d 1190, 1200 (9th Cir.), *cert. denied,* 555 U.S. 1031, 129 S.Ct. 597, 172 L.Ed.2d 456 (2008) (concluding that the district court did not abuse its discretion in decertifying a damages class because "Rule 23(b)(3) would not offer a superior method for fair and efficient adjudication in light of expected difficulties identifying class members"). Additionally, the Ninth Circuit previously cited with approval the court's statement in *O'Connor v. Boeing North American, Inc.,* 184 F.R.D. 311, 319 (C.D.Cal.1998), that a class definition should be "precise, objective, and presently ascertainable." *See Williams v. Oberon Media, Inc.,* 468 Fed.Appx. 768, 770 (9th Cir.2012). In *O'Connor,* the court explained that a class definition that is "precise, objective, and presently ascertainable" helps the court determine that "a class does in fact exist[,]" and its compliance with Rule 23 can be evaluated. *See O'Connor,* 184 F.R.D. at 319 (internal quotation marks omitted). The case law described above suggests that in this circuit, courts take a "practice-driven" approach to the requirements of Rule 23. *See* 1 *Newberg On Class Actions,* § 3:1, at p. 154 (5th ed.2011). Such an approach recognizes "that it may be easier and more efficient for courts to address [class definition] issues directly, rather than tangentially through the application of the multifactor Rule 23 analysis." *Id.* Thus, courts should "take notice" of whether the class definition is "precise, objective, and presently ascertainable[,]" *O'Connor,* 184 F.R.D. at 319, but they need not address such issues directly "unless they pose a problem in the context of the particular case at hand." 1 *Newberg,* § 3:1, at p. 154.

Plaintiff proposes to certify "[a] class of current and former non-exempt employees who were employed by Ulta and who worked in any Ulta store in California at any time from March 2, 2008, through the conclusion of this action[.]" (*See* Motion at 2). This class definition is precise, objective, and presently ascertainable. Although it may include a large number of individuals, it can "be ascertained by reference to objective criteria." *See Parkinson v. Hyundai Motor America*, 258 F.R.D. 580, 593–94 (C.D.Cal. 2008) (internal quotation marks omitted). Prospective class members can easily determine whether they worked as non-exempt employees in any of Ulta's California stores since March 2008, and defendant will be able to refer to its employment records to determine the same. *See, e.g., Cervantez*, 253 F.R.D. at 568 ("the term 'non-exempt' is subject to a precise legal definition"); *Arredondo*, 301 F.R.D. at 544–45 (agreeing with plaintiff's argument that "in the instant case, class members are readily identifiable by payroll records") (internal quotation marks omitted).

The class definition is sufficient for purposes of the Rule 23(a) analysis, and as described above, *see supra* at § I, the class meets the rule's requirements. However, in ways that are relevant to the Rule 23(b) analysis, the evidence shows some discrepancy in the application of defendant's exit inspection practices. For example, some class members may not have worked enough hours each day to have a meal break, and others may have been entitled to a meal break each day they worked. (*See, e.g.,* Alvarez Decl. at ¶ 12) ("at any given time, approximately 60% of [my employees] do not work long enough to get a meal period"). Some class members may never have worked a closing shift and only had an exit inspection when the store was open, and others may have undergone exit inspections during operating hours and after closing. (*See, e.g., id.* at ¶ 19) ("Approximately 50% of my employees have not worked the closing shift."). Nonetheless, the litigation as a whole is dominated by the factual and legal issues raised by Ulta's exit inspection policies; the existence of certain individualized facts will not preclude certification if class

members were subject to company policy in a way that gives rise to consistent liability (or lack thereof). *See, e.g., Kurihara*, 2007 WL 2501698, at *10 ("[C]ourts' discomfort with individualized liability issues is assuaged in large part where the plaintiff points to a specific company-wide policy or practice that allegedly gives rise to consistent liability.") (collecting federal and California cases); *Damassia v. Duane Reade, Inc.*, 250 F.R.D. 152, 160 (S.D.N.Y.2008) ("Where ... there is evidence that the duties of the job are largely defined by comprehensive corporate procedures and policies, district courts have routinely certified classes of employees challenging their classification as exempt, despite arguments about 'individualized' differences in job responsibilities.").

Thus, while the litigation as a whole is dominated by factual and legal issues raised by Ulta's exit inspection policies, the slight variance in employee experiences makes proceeding with subclasses a preferable solution for streamlining litigation that might otherwise become unwieldy. *See Armstrong*, 275 F.3d at 871 n. 28 ("Where appropriate, the district court may redefine the class"); *Legge v. Nextel Communications, Inc.*, 2004 WL 5235587, *17 (C.D.Cal.2004) (the court has "the authority to redefine the putative classes, or create subclasses"). Accordingly, the court will analyze the Rule 23(b)(3) requirements of predominance and superiority using the class definition provided above and splitting it into four subclasses, which are not mutually exclusive:

(1) Non-exempt workers who underwent exit inspections during their rest breaks ("rest break subclass").

(2) Non-exempt workers who underwent off-the-clock exit inspections during their meal breaks ("meal break subclass").

(3) Non-exempt workers who underwent off-the-clock exit inspections at the end of their shifts ("end of shift subclass").

(4) Non-exempt workers who underwent off-the-clock exit inspections at the end of the closing shift ("closing shift subclass").

While there are underlying facts and claims common to the entire class, using subclasses

will "expedite resolution of the case by segregating [certain factual and legal questions] which [are] common to some members" of the larger class. *See American Timber & Trading Co. v. First Nat. Bank of Oregon*, 690 F.2d 781, 786–87 (9th Cir.1982) (noting that "[e]ven if the court had not designated the subclass, it would have had to address the same issues" in evaluating the claims of the larger class, and the creation of subclasses was "within the district court's broad power under [Rule 23(d)] to adopt procedural innovations to facilitate management of the class action"); *In re United Energy Corp. Solar Power Modules Tax Shelter Investments Securities Litig.*, 122 F.R.D. 251, 253 (C.D.Cal.1988) ("a smaller subclass is appropriate where the subclass is created by the court for increased manageability, and where there is no antagonism between members of the subclass and members of the class at large"); *O'Connor v. Uber Technologies, Inc.*, 2015 WL 5138097, *23 (N.D.Cal.2015) ("it is possible Plaintiffs could demonstrate that some [subset of plaintiffs] could participate in a class action via an appropriately defined subclass or subclasses where there are no material variations within such subclass").

With the overall class and the four subclasses in mind, the court now turns to the predominance and superiority requirements of Rule 23(b)(3).

### B. *Predominance.*[22]

■■■ "The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Prods., Inc.*, 521 U.S. at 623, 117 S.Ct. at 2249. "Though there is substantial overlap between [the Rule 23(a)(2) commonality test and the Rule 23(b)(3) predominance test], the Rule 23(b)(3) test is far more demanding[.]" *Wolin*, 617 F.3d at 1172 (internal quotation marks omitted). "The predominance analysis under

Rule 23(b)(3) focuses on the relationship between the common and individual issues in the case and tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Wang v. Chinese Daily News, Inc.*, 737 F.3d 538, 545 (9th Cir.2013) (internal quotation marks omitted); *see In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 957 (9th Cir. 2009) (The "focus is on the relationship between the common and individual issues.") (internal quotation marks omitted). "[I]f the main issues in a case require the separate adjudication of each class member's individual claim or defense, a Rule 23(b)(3) action would be inappropriate." *Zinser v. Accufix Research Institute, Inc.*, 253 F.3d 1180, 1189, *amended* 273 F.3d 1266 (9th Cir.2001) (internal quotation marks omitted).

Because the parties make distinct arguments with respect to liability and remedies, the court addresses liability and remedies separately below. However, because it is relevant to the analysis of liability under all of plaintiff's asserted causes of action, the court will discuss briefly the evidence in the record.

■■■ As an initial matter, Ulta's exit inspection policy was consistently conveyed to all employees in the same manner, *i.e.*, as part of an official handbook provided to each employee during his or her orientation. (*See, e.g.*, Archer Depo. I at 30–31) (stating that the policies and procedures in the 2012 Associate Handbook apply to all Ulta stores in California). Further, and apparently pursuant to that policy, the evidence provided by both sides indicates that exit inspections regularly occurred off the clock. Declarants for both sides stated that they have worked off the clock or have inspected non-exempt employees' bags after the employees had clocked out. For example, some of defendant's declarants stated as follows:

---

**22.** The parties' briefing on predominance was inadequate. Plaintiff summarized the requirement, and then analyzed it in only three paragraphs (*see* Motion at 19–20), while defendant did the same in only four. (*See* Opp. at 21–23). Neither party addressed the legal standards underlying the claims in this case, and as a result their briefing did not shed any light as to whether common issues predominate over individual

ones with respect to any of plaintiff's claims. While "the burden of representation lies upon [the parties], and not upon the Court[,]" *U–Haul Co. of Nevada, Inc. v. Gregory J. Kamer, Ltd.*, 2013 WL 4505800, *2 (D.Nev.2013), the court carefully reviewed the record and will conduct the predominance inquiry on the basis of its review of the record and the limited briefing submitted by the parties.

- "[T]he employee will go clock out and the manager will move to the front of the store to be prepared to conduct the bag check" (Carrera Decl. at ¶ 18);

- "[I]t typically takes approximately one minute for employees to clock out, get their bags checked and leave the store" (Appx. of Evid., Exh. 7 (Declaration of Sharon Galbraith) at ¶ 21);

- "When I leave the store for a meal period or at the end of my shift, I get my things, then clock out, then find a manager to check my belongings" (Appx. of Evid., Exh. 12 (Declaration of Ashley Kahn) at ¶ 10);

- "[I]t typically takes about 3 minutes to clock out at the end of the day, collect my belongings, get my bag checked and leave the store" (Appx. of Evid., Exh. 14 (Declaration of Leslie Lopez ("Lopez Decl.")) at ¶ 17);

- "At the end of the shift, I get my stuff (i.e., wallet, phone, keys and maybe Tupperware), get clocked out at the front cashier register and then get my bag checked at or near the front door" (Appx. of Evid., Exh. 16 (Declaration of Michelle Martinez) at ¶ 12);

- "At the end of my shift, I clock out at the break room and then get my bag checks at the front of the store." (Mower Decl. I at ¶ 14).

The practice of clocking out prior to undergoing bag checks appears to be even more uniform at the end of closing shifts. Defendant's declarants who discussed exit procedures stated, uniformly and without exception, that the inspections occur after the employees have clocked out. (*See, e.g.,* Appx. of Evid., Exh. 29 (Declaration of Petina Simmons ("Simmons Decl.")) at ¶ 19 ("At the end of the shift, everyone clocks out and

walks to the front of the store together. Then I check all the employees' bags and they look at my bag. I set the alarm and we all walk out together."); *id.,* Exh. 24, Declaration of Jaimie Quinby at ¶ 17 ("The associates will clock out in the back room and then we will all walk up to the front of the store to check each other's bags."); *id.,* Exh. 21, Declaration of Rose Okine at ¶ 16 ("At closing time, all associates clock out in the back break room and walk to the front. Then, each employee's bag is checked one at a time, including my bag.").

Defendant asserts that the "cookie-cutter declarations submitted in support of plaintiff's motion are contradicted by their deposition testimony." (*See* Opp. at 13–15). The court disagrees, and finds that the declarations are largely consistent with the portions of the defense declarations described in the preceding paragraph. With respect to the minor inconsistencies defendant points out, it is clear that they reflect approximations of time spent waiting for and undergoing exit inspections; they do not reflect significant inconsistencies. *See, e.g., Arredondo,* 301 F.R.D. at 518 (Considering "the fact that [the testimony at issue] reflected simply lay approximation of times spent working, the Court cannot find they reflect significant inconsistencies."). Moreover, despite any arguable inconsistencies, the testimony does not suggest that off the clock exit inspections did not take place, only that estimates as to how long the waiting and inspections take may vary.[23] Inconsistencies in time estimates do not detract from the consistency and uniformity with which both plaintiff's and defendant's declarants describe the exit inspection process.

Courts routinely hold that proof of a defendant's uniform policy "is not plagued by individual inquiry, but is often sufficient to satis-

---

**23.** How long plaintiffs spent waiting for and undergoing exit inspections is an issue that goes to damages and perhaps to one prong of the *de minimis* standard. *See infra* at § II.B.2. Differences in the amount of time the inspections took do not raise individualized issues that defeat predominance. At most, that evidence shows that individual employees may be entitled to different damages. Yet the law is settled that individualized damages will rarely, if ever, preclude class certification. *See Leyva v. Medline Industries*

*Inc.,* 716 F.3d 510, 513 (9th Cir.2013); *see also Hall,* 274 F.R.D. at 166–67 ("where common liability issues that are susceptible to class-wide proof constitute a significant part of the case, predominance may be satisfied even where damages must still be proven by individually."); *Taylor v. FedEx Freight, Inc.,* 2015 WL 2358248, *14 (E.D.Cal.2015) ("So long as the class members here were harmed by the same conduct, disparities in how or by how much they were harmed does not defeat class certification.").

fy the predominance requirement." *Taylor,* 2015 WL 2358248, at \*11; *see also Wells Fargo,* 571 F.3d at 958 ("Of course, uniform corporate policies will often bear heavily on questions of predominance and superiority."); *Mendez v. R+L Carriers, Inc.,* 2012 WL 5868973, \*11 (N.D.Cal.2012) (indicating that claims based on written policies typically do not rely on individual proof); *Alba v. Papa John's USA, Inc.,* 2007 WL 953849, \*10–12 (C.D.Cal.2007) (collecting cases) (finding that common issues predominated because defendant had a written policy that applied in all of its stores). Indeed, this is precisely what plaintiff argues. (*See* Motion at 19) ("Each of the Class members' claims arise from Ulta's standardized policies and procedures causing common issues to be predominant in the collective resolution of those claims. Because these issues are overriding, predominance would exist even if numerous individual questions existed."). Critical liability questions will hinge upon whether off-the-clock exit inspections are required by Ulta's policy, and this question can be examined and resolved on behalf of the class as a whole.

Having carefully considered Ulta's argument that its policy is not uniformly carried out, (*see* Opp. at 21–24), the court is persuaded that, to the extent there are minor deviations from the policy at the store level, they have not yet been shown to predominate over the critical common question: whether the application of defendant's written exit inspection policy results in employees not being properly compensated for their work. *See, e.g., Frlekin v. Apple Inc.,* 309 F.R.D. 518, 525 (N.D.Cal.2015) ("[P]laintiffs have submitted substantial evidence that [defendant] had a state-wide written policy, which will serve as a common method of proof for all 52 California stores. [Defendant] will be allowed, of course, to try to explain away its own written policy and maybe it can convince a jury . . . that some stores disregarded the written directive from on high, but those minor, localized instances have not yet been shown to predominate over the centralized policy."); *see also id.* at 521 ("To summarize, [defendant] is probably correct that some deviation from the written policy occurred, but the showing by [defendant] is not power-

ful enough to establish that the written policy was the exception rather than the rule.").

Even if—despite the evidence to the contrary—Ulta succeeds in showing that its written policy was applied in different ways in different stores, common questions still predominate over any individual ones that will likely arise. The court explains that conclusion below, proceeding in the likely order of the issues to be evaluated at trial. *See Abdullah,* 731 F.3d at 957 (Where plaintiff's claims arise under state law, the court must "look[ ] to state law to determine whether the plaintiff['s] claims—and [defendant's] affirmative defenses—can yield a common answer that is 'apt to drive the resolution of the litigation.' ") (*quoting Dukes,* 131 S.Ct. at 2551); *Erica P. John Fund, Inc. v. Halliburton Co.,* 563 U.S. 804, 131 S.Ct. 2179, 2184, 180 L.Ed.2d 24 (2011) ("Considering whether questions of law or fact common to class members predominate begins . . . with the elements of the underlying cause of action.") (internal quotation marks omitted).

### 1. Liability Questions.

In her FAC, plaintiff asserts causes of action for: (1) failure to pay overtime compensation, Cal. Lab.Code § 1198, *et seq.*; (2) failure to compensate for all hours worked, Cal. Lab.Code § 1198, *et seq.*; (3) failure to pay all wages due upon discharge, Cal. Lab. Code § 201, *et seq.*; (4) failure to provide required meal periods, Cal. Lab.Code § 226.7, *et seq.*; (5) failure to authorize or permit required rest periods, Cal. Lab.Code § 226.7, *et seq.*; (6) failure to maintain required records, Cal. Lab.Code § 1174.5, *et seq.*; (7) waiting time penalties, Cal. Lab. Code § 203; and (8) unfair competition, Cal. Bus. & Prof.Code § 17200, *et seq.* (*See* FAC at ¶¶ 32–102).

All of plaintiff's claims hinge on her first proving that the time that non-exempt Ulta employees spent waiting for and undergoing exit inspections is compensable as working time under California law. (*See, e.g.,* Motion at 2) ("The basis of Plaintiff's Complaint is Ulta failed to pay, and continues to fail to pay, employees for off-the-clock time spent inside the stores waiting for exit inspec-

tions."). Accordingly, the discussion below addresses the elements and factors that the court will need to consider in evaluating that claim.

### a. *Whether Time Spent Waiting For and Undergoing Exit Inspections is "Hours Worked" Under California Law.*

Plaintiff asserts, and defendant does not contest, that IWC Wage Order 7 (8 C.C.R. § 11070) applies in this case.[24] (*See, e.g.*, FAC at ¶ 33; *see, generally*, Opp.). IWC Wage Order 7 applies to "all persons employed in the mercantile industry whether paid on a time, piece rate, commission, or other basis[.]" 8 C.C.R. § 11070(1). It contains the following definition of "hours worked:" "the time during which an employee is subject to the control of an employer, and includes all the time the employee is suffered or permitted to work, whether or not required to do so." *Id.* at § 11070(2)(G).

In *Morillion,* the California Supreme Court clarified that the definition of "hours worked" "encompasses a meaning distinct from merely 'working,'" 22 Cal.4th at 584, 94 Cal.Rptr.2d 3, 995 P.2d 139, and held that the compulsory travel time at issue in the case was compensable because during that time, the employees were "subject to the control of [their] employer." *Id.* at 578, 94 Cal.Rptr.2d 3, 995 P.2d 139. Even time spent waiting for the buses was compensable. *Id.* at 587, 94 Cal.Rptr.2d 3, 995 P.2d 139. As the *Cervantez* court aptly stated, the *Morillion* Court "distinguished time spent in an ordinary commute, or time spent on personal grooming required for a job, which are not compensable. The primary distinguishing factor is the level of control the employer exercises by determining when, where, and how plaintiffs must travel.... [T]hey were not free to use the time effectively for their own purposes."

*Cervantez,* 253 F.R.D. at 571 (internal quotation marks, citations, and alterations marks omitted). The *Morillion* Court also stated that "hours worked" "can include work such as unauthorized overtime, which the employer has not requested or required [if] ... [t]he employer knows or has reason to believe that [the employee] is continuing to work[.]" 22 Cal.4th at 585, 94 Cal.Rptr.2d 3, 995 P.2d 139.

Although the most reasonable reading of defendant's written exit inspection policy indicates that the employee must clock out before his or her bag is checked, defendant nevertheless contends that its policy does not require that bag checks occur off the clock. (*See* Opp. at 22). Many of defendant's declarants make statements to that effect and further add, "[a]lthough I inform [employees] that they must have their bags checked prior to exiting the store, I do not instruct them that they must clock out prior to getting their bags checked." (*See* Carrera Decl. at ¶ 21; *see also* Jacobs Decl. at ¶ 16 (same)); Jarboe Decl. at ¶ 16 (same); Martin Decl. at ¶ 19 (same); Plotkin Decl. at ¶ 19 ("I do not specify whether they need to clock out before or after a bag check."). Many also state that "[i]t is not against Ulta's policy for employees to have their bags checked and to then clock out at the front register." (*See* Carrera Decl. at ¶ 22; *see also* Jacobs Decl. at ¶ 17 (same); Karmody Decl. at ¶ 19); Martin Decl. at ¶ 20 (same); Ortiz Decl. at ¶ 17 (same); Slingerland Decl. at ¶ 19 (same)).

Putting aside the fact that defendant's assertions appear to contradict defendant's own internal written policy, this argument misses the mark. The policy may be evidence that the employer required its employees to work off the clock, but that is not the only way plaintiff can establish liability.[25] As de-

---

24. The IWC has promulgated several orders covering specific industries and occupations. All wage orders contain the same definition of "hours worked" as wage order No. 7. *See Morillion v. Royal Packing Co.,* 22 Cal.4th 575, 581, 94 Cal.Rptr.2d 3, 995 P.2d 139 (2000); *Aguilar v. Association for Retarded Citizens,* 234 Cal.App.3d 21, 25, 285 Cal.Rptr. 515 (1991). "The IWC's wage orders are to be accorded the same dignity as statutes." *Brinker Rest. Corp. v. Superior Court,* 53 Cal.4th 1004, 1027, 139 Cal.Rptr.3d 315, 273 P.3d 513 (2012).

25. The court is mindful that it may not rely on uniform policies "to the near exclusion of other relevant factors touching on predominance." *In re Wells Fargo,* 571 F.3d at 955. However, not only does a common sense—indeed the most reasonable—reading of the policy indicate that the employee must clock out before his or her bag is checked, (*see* 2011 New Hire Orientation manual at D238–39), but there is substantial evidence that defendant's exit inspection policy was

scribed above, "hours worked" "can include work such as unauthorized overtime, which the employer has not requested or required [if] ... [t]he employer knows or has reason to believe that [the employee] is continuing to work." *Morillion*, 22 Cal.4th at 585, 94 Cal.Rptr.2d 3, 995 P.2d 139. Accordingly, that company policy may not have required employees to clock out prior to exit inspections does not turn the question of whether the time was "hours worked" into an individualized inquiry. *See, e.g., Adoma v. University of Phoenix, Inc.,* 270 F.R.D. 543, 548 n. 4 (E.D.Cal.2010) ("Although such a policy, if proven, would provide evidence in support of [an off the clock claim], such a policy is neither necessary to the individual plaintiffs' claims nor for a showing of predominance."). If Ulta knew or should have known that off the clock inspections were taking place, a written policy requirement (or lack thereof) is of no consequence.

There is indeed evidence suggesting that Ulta knows that exit inspections occurred off the clock. The first and perhaps most obvious piece of evidence is the policy itself which, even operating under defendant's premise that it is not actually a requirement, shows that Ulta knows or should have known that it is interpreted as one. *See Wells Fargo,* 571 F.3d at 958–59 ("Such centralized rules, to the extent they reflect the realities of the workplace, suggest a uniformity among employees that is susceptible to common proof."). For example, there is evidence that Ulta knows and intends its exit inspect policy to be read as a requirement. *(See, e.g.,* Key Corporate Communication at D542 (*"As you are performing an exit inspection:* 'Did you punch out for your shift?' ") (emphasis in original); *Id.* ("remember to perform Exit inspections in an expeditious manner; employees should not have to wait to be checked out"); 2011 New Hire Orientation Manual at D239 ("[p]ersonal belongings should not be gathered until you are clocked out for the day"); Appx. of Evid., Exh. 27 (Declaration of Nancy Schmeling) at ¶ 10 ("I do make it a point in my General Manager training to tell managers that once an employee is off the clock, managers need to be

respectful of that employee's time and minimize the amount of time he or she has to wait to leave the store.")).

Finally, there is evidence indicating that, at the very least, the practice of performing exit inspections off the clock is common enough that defendant should know of it. *(See, e.g.,* Carrera Decl. at ¶ 18, Fisher Decl. at ¶ 16; Jacobs Decl. at ¶ 17; Jarboe Decl. at ¶ 15; Karmody Decl. at ¶ 19; Martin Decl. at ¶ 20; Meikel Decl. at ¶ 21; Osborne Decl. at ¶ 19; Appx. of Evid., Exh. 26 (Declaration of Richard Sanders ("Sanders Decl.")) at ¶ 18 (General Managers acknowledging, without reference to time of day or shift, that their employees generally "clock out ... before getting their bags checked[.]")). Regardless of the conclusion ultimately drawn from the evidence, however, there is no evidence currently before the court indicating that individualized inquiry would be required for this question. Both plaintiff and defendant submitted substantial evidence that the overwhelming majority of employees clock out before their exit inspections. As a result, the court is satisfied that questions related to whether Ulta requires, knows, or should know that its employees clock out before having their bags checked is susceptible to common proof.

Defendant makes a related argument that because clocking out in advance of exit inspections is not required, employees can choose whether to clock out before or after their exit inspections, and this element of choice raises individualized issues with respect to whether the time was really "hours worked." *(See* Opp. at 9) ("Plaintiff could also have sought out a manager to perform a bag check while she was still on the clock, but did not because she 'never thought about it.' "). Defendant also emphasizes employee choice when it asks, "did the employee leave the store for a break? If so, did the employee bring a bag? If so, was it the issued bag[?]" *(See id.* at 22). Ulta further contends that a "bag check is easily minimized or avoided by not bringing a bag to work[,]" *(id.* at 10), and that "[t]he percentage of hourly employees who did not bring any bag to work varies" from 2% to 95%. *(Id.).* Fi-

consistently applied to all non-exempt employees.

nally, defendant argues that "employees may leave their bags in their lockers during breaks. Employees who do so only have to catch a manager's attention as they leave, flash any carried items and immediately leave the store. This approach requires minimal or no waiting[.]" (*Id.*) (footnotes omitted).

■ The evidence here demonstrates, however, that employees' decisions not to leave the store on breaks and/or not to take a bag are influenced by their not wanting to spend uncompensated time waiting for and undergoing exit inspections. (*See, e.g.,* Moore Depo. II at 144 ("[i]f I knew [it] was going to be a while, it's like, I didn't want to stand there and have them have to search it. I'm just going to stuff my money in my pocket and get out of there as fast as I can."); Cha Decl., Exh. F (Excerpts from the Deposition of Joyce Khremian at 65) (Q: Were there any times that you were dissuaded from actually going out to lunch because you thought it might take too long to actually be able to leave? A: Yes."); Cha Decl., Exh. G (Excerpts from the Declaration of Richard Medina at 79–80) ("[I]f I know it's going to take longer than five minutes, I don't—I wouldn't—I would just stay in the store. It wouldn't be worth my value to leave."). First, the fact that Ulta's exit inspection policy actually causes employees to change their work-related behavior—a point both

plaintiff and defendant concede—is evidence of its class-wide reach and consistent implementation. In other words, if the policy were not carried out in all stores, if the inspections did not regularly occur after employees clocked out, or if employees did not regularly need to wait more than just a few minutes, then the policy would have little, if any, effect on employee behavior. Second, the variation in employee choices that defendant points to is irrelevant to the question of whether the time spent in exit inspections is "hours worked." Again, that depends upon whether the employee "is suffered or permitted to work, whether or not required to do so," 8 C.C.R. § 11070(2)(G), which in turn depends upon Ulta's level of control over its employees during such inspections.[26] That some employees on some days or on some breaks did not undergo exit inspections—not because of non-uniformity in exit inspection practices but because of their own efforts to avoid them—does not predominate over the common overriding questions, described above and in the preceding sections, relating to whether plaintiffs are owed compensation for the time they spent in such inspections. Even if it were relevant, the court would hesitate to turn what appears to be rational employee behavior to mitigate the effects of potentially unlawful practices into an individualized inquiry that could defeat class certification.[27] If the employees knew that they

---

**26.** An employee's choice to work overtime or through a break, even if not required to do so, is irrelevant to whether the employee is "suffered or permitted to work" and is thus irrelevant to whether the employee is entitled to compensation. *See, e.g., Morillion,* 22 Cal.4th at 587, 94 Cal.Rptr.2d 3, 995 P.2d 139 ("[t]he level of the employer's control over its employees, rather than the mere fact that the employer requires the employee's activity, is determinative."); *Arredondo,* 301 F.R.D. at 524 ("It is beyond dispute that to the extent Plaintiffs engaged in voluntary pre-shift work, Defendants are liable under relevant California law for additional wages or overtime for that work."). This is settled law, and, not wanting to be liable for such employee choices, Ulta makes clear in its manuals that off-the-clock work is prohibited. (*See* People Manual at D127).

**27.** The court is also concerned that defendant's argument in this regard simply ignores the workplace reality that individuals need to bring items to work such as medications, feminine hygiene

products, and other personal items. Query whether employees have protectable privacy rights in keeping such items in a bag, purse, backpack, etc., outside the view of their colleagues and supervisors. Further, not only does leaving such items in a car in a parking lot present security risks, but leaving them outside the workplace leaves workers at risk of temperature fluctuations affecting the efficacy of such items, and perhaps more significantly, not being able to access these items when they need them. Another equally important fact is that many men and women, especially low wage workers, bring food with them to work because they cannot afford to buy lunch everyday. Arguably, a policy that effectively discourages workers from bringing food to work in a bag or lunch container—as there is no other way to carry a lunch—undermines California's labor law to provide eligible employees with their mandated meal periods. In short, to claim that bringing any of these items to work in a bag—whether food, medications, and/or other personal items—results from employee "choice" simply has no basis in reality.

would be paid for that time, they may well have made different choices.[28]

### b. Whether Hourly Employees Were Paid for All Hours Worked.

■ To prove an off the clock claim, a plaintiff must demonstrate "(1) he or she performed work, for which (2) he or she did not receive compensation, and of which (3) the employer was aware or should have been aware." *Stiller,* 298 F.R.D. at 628 (citing *Adoma,* 270 F.R.D. at 548; *Ortiz v. CVS Caremark Corp.,* 2013 WL 6236743, *9 (N.D.Cal.2013); *Morillion,* 22 Cal.4th at 585–86, 94 Cal.Rptr.2d 3, 995 P.2d 139). Here, if plaintiff proves that the time spent waiting for and undergoing exit inspections is properly considered "hours worked" under California law, she will have met requirement (1) and requirement (3). *See supra* at § II.B.1.a. Establishing those elements will not require individualized inquiries that predominate over those that the putative plaintiff class has in common. (*See id.*). Then, in order to establish that Ulta must pay the employees for the hours worked, plaintiff must present evidence related to requirement (2), *i.e.,* that Ulta hourly employees were not paid for the time. This question applies only to the meal break, end of shift, and closing shift subclasses.[29]

Defendant argues that this will require significant individualized questions because some managers in some stores have their employees undergo inspections while they are still on the clock. (*See* Opp. at 5) ("Numerous Ulta employees have their bags checked while on the clock."). In support, defendant cites to declarations that include statements such as "half of the time, I will retrieve my bags from the back and have them checked up front first before clocking out" (Appx. of Evid., Exh. 30 (Declaration of Bianca Siordia ("Siordia Decl.")) at ¶ 11); "[o]n approximately two occasions, the other employee(s) closing the store and I have checked each other's bags in the back of the store before clocking out" (Lopez Decl. at ¶ 12); and "there have been times where employees have had their bags checked before clocking out." (Tran Decl. at ¶ 18). These statements only lend support to plaintiff's claim that there is little variation between stores and managers. If only three of defendant's 35 employee declarants[30] state that on-the-clock inspections occur "half of the time," have happened on "approximately two occasions," or even that "there have been times" when they have occurred, the obvious conclusion is that there have been many more inspections that occurred off the clock; determining that they occurred in this case, even in every California store, is unlikely to require individualized analysis. In fact, one General Manager stated that "[i]n late 2012 or early 2013, [she] tried to implement a practice where employees would collect their belongings and clock out at the front register *before* a manager checked their bags. For about a months' [sic] period, approximately 40% [of employees] would get their bag [sic] checked before clocking out." (*See* Plotkin Decl. at ¶ 21 (emphasis in original)).

Again, the conclusion that reasonably can be drawn from a statement that less than half of employees in one store went through exit inspections on the clock for a one-month period more than two years ago is not that there is significant variation in exit inspection practices. Instead, the evidence suggests

---

**28.** The court has reviewed Defendant's Notice of Recent Decision regarding the summary judgment decision in the *Frlekin* case. (*See* Defendant's Notice of Recent Decision, Dkt No. 114). However, that decision has little bearing on the instant case because it (a) related to the merits of the class members' claims rather than the propriety of class certification; and (b) was based on "plaintiffs['] agree[ment] to limit their claims to the theory that all employees voluntarily brought bags to work solely for personal convenience." (*See* Notice of Recent Decision, Exh. A at 13–14).

**29.** The employees in the rest period subclass were on the clock during their inspections, and

plaintiff has not alleged that she was not paid for any hours during which she was clocked in. (*See, generally,* FAC). Accordingly, the liability analysis for the rest period subclass will include whether the time was "hours worked" under California law, *see supra* at § II.B.1.a., but instead of asking whether the employees in the rest period subclass were uncompensated for that time, the court will ask whether that time cut into their legally mandated breaks. *See infra* at II.B.1.d.

**30.** *See supra* at note 13.

that the vast majority of exit inspections in that store occur off the clock. Further, nine of the General Manager declarants stated, "because most employees naturally have to go to the back room to retrieve their belongings from their locker at the end of their shifts, they tend to clock out in the back room before getting their bags checked at the front of the store." (Fisher Decl. at ¶ 16; *see also* Carrera Decl. at ¶ 22; Jacobs Decl. at ¶ 17; Jarboe Decl. at ¶ 16; Karmody Decl. at ¶ 19; Martin Decl. at ¶ 20; Meikel Decl. at ¶ 21; Osborne Decl. at ¶ 19; Sanders Decl. at ¶ 18). Not one declarant stated that there are no off-the-clock exit inspections in his or her store. (*See, generally,* Appx. of Evid.). Therefore, the most that can be said about these declarations is that they create questions as to whether off the clock exit inspections occurred all of the time or only most of the time; defendant has not presented evidence of variation in practice that renders individual questions predominant over common ones.

The same reasoning applies to defendant's contention that some General Managers adjust their employees' punch-out times if they had to wait off the clock for a long period of time before an inspection. (*See, e.g.,* Beach Decl. at ¶ 18 ("If an employee clocks out before having their bag checked, I make the proper adjustments in the Kronos automated time-tracking software"); Wendt Decl. at ¶ 21 ("If I notice that employees have to wait to have their bag checked after they have clocked out, I adjust their time punch so they are paid for the time spent waiting."). First, it appears from both plaintiff's and defendant's declarations and deposition testimony that only these two managers ensured that their employees' exit inspections were performed on the clock, and one of those two only adjusts punch times if she notices an employee waiting. This small variation does not defeat predominance.

Further, that some small fraction of California employees who waited for inspections off the clock may have had their time adjusted by managers does not mean that answering the question here—did employees wait for or undergo these inspections without compensation—requires any individualized analysis. The evidence indicates that very few employees, if any, were compensated for all time waiting for and undergoing every single exit inspection. *See, e.g., Arredondo,* 301 F.R.D. at 526 (certifying the class, stating that "[w]hile it is true that some defense declarants stated that they did not perform pre-shift work, nearly all of Plaintiffs' declarations, and a significant number of Defendant's declarations, assert that they did"); *Rai,* 308 F.R.D. at 256 ("[W]hile the evidence [one employee] presents suggests that [employees] sometimes are paid for turn-in time, it is not sufficient to rebut Plaintiffs' substantial evidence that [defendant] has policies and practices that result in [employees] not being compensated for all pre-departure and turn-in time.").

In short, although there may be some differences with respect to the application of defendant's exit policy to its employees, the question to be resolved is not an individual one. To the contrary, the common question remains the overall impact of defendant's inspection policy on all of its employees, not on whether any one employee happened to have his or her bag checked while on the clock or before the start of his or her break.

#### c. *The De Minimis Defense.*

 In evaluating the *de minimis* defense, the court considers: (1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional activity.[31] *See Lindow v. United States,* 738 F.2d 1057, 1063 (9th Cir. 1984) (applying the *de minimis* defense to a claim of unpaid overtime under the federal Fair Labor Standards Act). Defendant asserts that the "*de minimis* defense applies to putative class members on an individualized basis, making class treatment inappropriate here." (Opp. at 20). Yet defendant provides

---

**31.** This standard was cited with approval by the Ninth Circuit in *Gillings v. Time Warner Cable LLC,* 583 Fed.Appx. 712, 714 (9th Cir.2014), which, after an analysis of case law and other sources, predicted that the de minimis doctrine would apply under California law even though "[t]he California Supreme Court has never ruled on [its] applicability ... to California wage claims."

no explanation, analysis, or authority to support this conclusory assertion. (*See, generally, id.*).

Further, assuming defendant has not waived the affirmative defense, *see supra* at note 18, the court, based on its thorough review of the record, is persuaded that consideration of the *de minimis* defense does not preclude class certification. Although there may be a few individualized inquiries required with respect to the first factor (the difficulty of recording additional time), any difficulties or individualized questions that arise can be managed by the use of subclasses. The practical administrative difficulty of recording the additional time may be different for the rest break subclass, as employees who take rest breaks do not clock out prior to taking their rest.[32] (*See* Ryan Decl. at ¶ 5) (stating that employees are required to punch in when they start working, out and back in for lunch, and out again at the end of their shifts). Employees leaving for lunch breaks or at the end of their shifts, on the other hand, do clock out. (*See id.*). Further, because specific procedures apply at the end of closing shifts (*see, e.g.*, Beach Decl. at ¶ 20), the practicalities of tracking time for those employees may be different than for those that take place while the store is still open. And, considering the fact that not all employees have worked the closing shift, (*see, e.g.*, Alvarez Decl. at ¶ 19 ("[a]pproximately 50% of my employees have not worked the closing shift"); Appx. of Evid., Exh. 2 (Declaration of Cecilia Barragan) at ¶ 19 ("the associates working the closing shift vary"), certain questions may apply to some employees and not to others. Within each of the subclasses, however, there is little evidence of variation on this factor. Descriptions of closing procedures were strikingly uniform, *see, e.g.*, *supra* at § II.B. ("defendant's declarants who discussed exit procedures stated, uniformly and without exception, that the inspections occur after the employee have clocked out"), as were descriptions of rest break time tracking. (*See, e.g.*, Motion at 6) ("exit inspections are always performed ... while the employee is already on their [sic] rest break"); (*see also, e.g.* Simmons Decl. at ¶ 14, Martin Decl. at ¶ 9, Carrera Decl. at ¶ 14) (defendant's declarants state that all rest breaks begins after bag checks have been completed). As a result, any variation with respect to difficulties tracking time will be managed by the use of subclasses. Within each subclass, this question is capable of resolution by common proof.

The other *de minimis* factors—the aggregate amount of time spent on the activity and the regularity of the activity—can be answered on behalf of the class as a whole with little individualized analysis. For example, courts considering the aggregate amount of time spent on work activities may consider estimates and averages, as opposed to calculating by individual employee. *See, e.g., Rutti v. Lojack Corp., Inc.*, 596 F.3d 1046, 1059 (9th Cir.2010) (stating that "it may be possible to reasonably determine or estimate the average time[,]" and using plaintiff's estimate of "about 15 minutes a day" for its analysis); *Maciel v. City of Los Angeles*, 569 F.Supp.2d 1038, 1051–52 (C.D.Cal.2008) (analyzing the *de minimis* defense using "reasonable estimates" because "an average range of how long the activity takes [was] reasonably discernable"). In this case, both parties have offered estimates of the amount of time spent on exit inspections, and there is no reason to believe that considering such estimates will not be appropriate at trial.

Finally, the regularity of the activity is something the court has addressed at length above. *See supra* at § II.B.; (*see also* 2011 Employee Handbook at D221 (mandating employee exit inspections "anytime they exit the store" regardless of type of break or shift). The fact that the inspections are required every time an employee leaves the store is evidence that this factor can be considered on a class-wide basis without substantial individual inquiry, and without significant variation among subclasses. (*See, e.g.*, Opp. at 9) (chart summarizing testimony indicates that bag checks take approximately 30 seconds to five minutes, not differentiating

---

**32.** This is likely a non-issue, however, as the *de minimis* defense would not apply to the rest break subclass, as they were clocked in—and presumably paid—during their exit inspections. *See infra* at § II.B.1.d.

based on type of break or shift); Supporting Declarations (inspections occurred every time they left the store; time estimates do not differentiate based on the type of break or shift).

In short, although there may be some *de minimis* questions that require analysis tailored to specific subclasses, the relevant questions are still common ones that predominate over any individualized issues with respect to each subclass. Nonetheless, even without subclasses, these individual questions will arise, if at all, only after significant common questions of law and fact have been answered—such as whether clocking out before an inspection is required, whether employees are under the control of Ulta while they wait for exit inspections, and whether defendant has waived the *de minimis* defense. *See, e.g., Otsuka v. Polo Ralph Lauren Corp.*, 251 F.R.D. 439, 448 (N.D.Cal.2008) ("Thus, while [defendant's defenses] might require inquiries into the individual experiences of class members, these individual questions will arise only after significant common questions of law and fact have been answered, and may not arise at all in the liability context.").

### d. *Liability Questions Specific to the Rest Break Subclass.*

As described above, employees who take rest breaks do not clock out prior to taking their breaks, whereas employees clock out before their lunch breaks and at the end of their shifts. (*See* Ryan Decl. at ¶ 5). Accordingly, while plaintiff uses the phrase "off the clock" to refer to the alleged rest period violations, the claim is actually based upon plaintiff's assertion that a "significant portion of each break were [sic] and currently are [sic] spent undergoing ... exit inspections, as required by Ulta of every employee[.]" (*See* FAC at ¶ 79). The essential question, then, just like with the other subclasses, begins with asking whether the time spent waiting for and undergoing exit inspections constitutes "hours worked" under California law. *See supra* at § II.B.1.a. Next, however, instead of asking whether that time was compensated or whether plaintiff is entitled to compensation because it is *de minimis*, plaintiff must establish that those "hours worked"

cut into employees' breaks such that they received breaks shorter than that required by the California Labor Code. In other words, the question is whether Ulta's exit inspection policy prevents employees from fully realizing the breaks to which they were entitled.

In California, "the rest time that must be permitted [is] the number of hours worked divided by four, rounded down if the fractional part is half or less than half and [rounded] up if it is more ..., times 10 minutes. Thus ... an employee would receive no rest break time for shifts of [three and a half hours] or less, 10 minutes for shifts lasting more than [three and a half hours] up to six hours, 20 minutes for shifts lasting more than six hours up to 10 hours, and so on." *Brinker*, 53 Cal.4th at 1029, 139 Cal.Rptr.3d 315, 273 P.3d 513. Whether the rest period subclass is entitled to relief requires a determination of whether the 10–minute clock started once they were finished with their inspections or once they left their workstations to go wait for the inspections. Plaintiff alleges that a consistently-applied and uniform policy meant that they had rest breaks shorter than that required by California law. (*See* FAC at ¶ 79). Defendant and plaintiff present opposing evidence on this point, but neither party's evidence indicates that there was variation among the employees' experiences. For example, the General Manager declarants that discuss rest periods state that employee rest periods do not begin until after the exit inspection. (*See, e.g.,* Simmons Decl. at ¶ 14 ("If employee leave for their rest breaks, their break begins after their bag check, once they walk out the front door."); Martin Decl. at ¶ 9 ("rest breaks do not begin until after [employees] have had their bags checked"); Carrera Decl. at ¶ 14 (same); Appx. of Evid., Exh. 34 (Declaration of Michelle Vega) at ¶ 11 (same); Hofacre Decl. at ¶ 11 (same)). Plaintiff, on the other hand, states that the "exit inspections are *always* performed ... while the employee is already on their [sic] rest break." (Motion at 6) (emphasis added). Whether the employees' breaks started while they waited for the inspections or once they exited the store is an issue about which there is competing evi-

dence that needs to be resolved at trial. These questions predominate over individual ones because there is no evidence of any variation in employee experience with rest breaks. In other words, there is no evidence that any individualized inquiry will be required with respect to liability questions for the rest break subclass.

### e. Liability Questions Specific to the Lunch Break Subclass.

The issues specific to the lunch break subclass are similar to those raised by the rest break subclass. Again, while plaintiff uses the phrase "off the clock" to refer to the alleged lunch break violations, the claim is actually based upon plaintiff's assertion that "[t]he employees' lunches were not extended for the time they waited for and were searched, all while off the clock, which resulted in less than 30 minutes [sic] meal breaks." (FAC at ¶ 71; *id.* at ¶ 72 ("Defendant failed to give its employees the required meal time period because a significant portion of each meal period was and is spent undergoing off the clock exit inspections[.]"). Just like the rest break subclass, instead of asking whether that time was compensated or whether plaintiff is entitled to compensation because it is *de minimis*, plaintiff must establish that those "hours worked" caused employees to have lunch periods shorter than that required by the California Labor Code.

IWC Wage Order 7–2001 provides that "[n]o employer shall employ any person for a work period of more than five (5) hours without a meal period of not less than 30 minutes[.]" 8 C.C.R. § 11070(11)(A); *see* Cal. Lab.Code § 512 (an employer must provide 30–minute meal period within a work day at specified intervals absent special circumstances not relevant here); *see* Cal. Lab. Code § 226.7(b) (employer may not require an employee "to work during a meal or rest ... period mandated pursuant to an applicable ... order of the Industrial Welfare Commission[.]"). "An employer's duty with respect to meal breaks ... is an obligation to provide a meal period to its employees. The employer satisfies this obligation if it relieves its employees of all duty, relinquishes control over their activities and permits them a reasonable opportunity to take an uninterrupted

30–minute break, and does not impede or discourage them from doing so." *Brinker*, 53 Cal.4th at 1040, 139 Cal.Rptr.3d 315, 273 P.3d 513 (further stating that employer "may not undermine a formal policy of providing meal breaks by pressuring [its] employees to perform their duties in ways that omit breaks"). If the employer knows that meal breaks are missed, shortened, or unduly delayed because the employer has instructed the employee to work, or has otherwise impeded the taking of breaks, the employer has violated its obligations, absent exceptions that are not applicable here. *See id.* at 1039–40, 139 Cal.Rptr.3d 315, 273 P.3d 513. When "an employer fails to provide an employee a meal period in accordance with [these provisions of California law], the employer shall pay the employee one (1) hour of pay at the employee's regular rate of compensation for each workday that the meal period is not provided." 8 C.C.R. § 11070(11)(D); *see* Cal. Lab.Code § 226.7(b).

Whether or not the lunch break subclass is entitled to relief requires a determination of whether the 30–minute clock started once they clocked out to go wait for their inspections or whether it started once they were finished with their inspections. The evidence suggests that off-the-clock exit inspections were the rule rather than exception. *See, e.g., supra* at § II.B. The court need not repeat its analysis of that evidence here. While the questions related to length of employee lunch breaks may not apply to the class as a whole, they are common to the lunch break subclass and they predominate.

In sum, the court finds that the putative class satisfies the predominance requirement of Rule 23(b)(3). Common questions of law and fact predominate over individualized issues, and analysis of the few individualized issues that will arise will be streamlined and managed through the use of subclasses. Regardless of subdivision, however, plaintiff has provided substantial evidence of the existence of a company-wide practice whereby employees are subject to inspections and not compensated properly for the time spent on those inspections. Although defendant has submitted some evidence that some employees experienced slight variations in the im-

plementation of the policy, it has not provided sufficient reasons that determining whether uncompensated work was performed could not be determined on a class-wide basis. The court is convinced that the overarching legal question at the core of plaintiff's case—whether this policy results in hours worked off the clock—is common and predominant.

### 2. Damages Questions.

■ Defendant argues that regardless of whether common questions predominate in the liability context, plaintiff cannot satisfy the predominance requirement unless she also "show[s] that damages can be proven on a class-wide basis. When questions of individual damages overwhelm questions common to the class, certification is not appropriate." (*See* Opp. at 24) (citing *Comcast*, 133 S.Ct. at 1433) (footnotes omitted). Defendant then asserts that damages inquiries in this case are "completely individualized" for three reasons: first, because "there are no records of time spent waiting for a bag check[,]" second, because "the time spent waiting for a bag check varie[s] widely[,]" and third, because "the reasons why an employee had to wait for a manager varie[s] according to numerous individualized factors[.]" (*See* Opp. at 24–25). Defendant's assertions are unpersuasive.

As an initial matter, defendant misstates the standard set forth in *Comcast*. *Comcast* found that testimony proffered to show that damages could be demonstrated at trial by a test common to all class members could not actually do so because the damages calculation method was not sufficiently tied to the liability case. *See Comcast*, 133 S.Ct. at 1433–35. The Court did not hold that damages must be shown through classwide evidence for common liability issues to predominate. *See, generally, Comcast*. In *Leyva*, a wage and hour case, the Ninth Circuit rejected defendant's interpretation of *Comcast*. *See Leyva*, 716 F.3d at 513 (reversing a denial of class certification because "damage calculations alone cannot defeat certification") (internal quotation marks omitted). As the court explained, the *Comcast* Court "concluded that a model purporting to serve as evidence of damages in [a] class action

must measure only those damages attributable to [the theory of liability]." *Id.* at 514 (internal quotation marks omitted). In *Leyva*, the court found that "if putative class members prove [defendant's] liability, damages will be calculated based on the wages each employee lost due to [defendant's] unlawful practices." *Id.; see also id.* at 513 (further recognizing that "damages determinations are individual in nearly all wage-and-hour class actions); *see also Taylor*, 2015 WL 2358248, at *14 ("[I]f class members prove [defendant's] liability, all the damages will flow from Plaintiff's theory of liability: [defendant's] unlawful ... pay policy. This court is not persuaded to vary from Ninth Circuit precedent that the presence of individualized damages, by itself, defeats class certification") (citation and internal quotation marks omitted); *Frlekin*, 309 F.R.D. at 526 (damages calculations "could turn out to consume considerable time, but *Leyva* holds we may, if not must, do so for damages issues"). Here, if the class prevails on its liability claims (which, again, will depend upon the common application of Ulta's exit inspection policy to all of its employees and *not* upon an individualized accounting of hours worked and breaks or meals missed), only then will the court determine how many hours of pay each plaintiff is entitled to, how many meal and/or rest breaks each plaintiff was denied, and the resulting penalties that defendant must pay.

Further, the fact that damages calculations may be more difficult because "there are no records of time spent waiting for a bag check" is of little consequence. Where an employer has failed to keep records, "the consequences for such failure should fall on the employer, not the employee." *Taylor*, 2015 WL 2358248, at *16 (internal quotation marks omitted). A defendant's "failure in record management, if any, or the difficulty in compiling precise records does not defeat class certification." *Id.; Arredondo*, 301 F.R.D. at 545 ("Class action litigation grows out of systemic failures of administration, policy application, or records management ... to allow the same systemic failure to defeat class certification would undermine the very purpose of class action remedies.").

What's more, the court finds it significant that, due to defendant's strong resistance to plaintiff's discovery, plaintiff was not able to engage in discovery regarding damages. Although plaintiff sought putative class members' timekeeping records, she was unable to obtain the records. (*See* Reply at 8 n. 1). Failure to have analyzed these records and present a damages calculation proposal at this juncture is not fatal to class certification, and given the continuity between liability and damages in wage and hour cases, the court is not concerned that any individualized issues that do arise would make a trial unmanageable. *See, e.g., Arredondo*, 301 F.R.D. at 542 ("Plaintiffs' failure to describe a method for determining damages without being provided the opportunity to conduct discovery on the issue shall not prevent the Court from establishing predominance.").

Finally, plaintiff need not know precisely how she will prove damages at this time. If calculation of individualized damages is complex, the court has numerous efficient means to resolve such issues, including questionnaires, surveys, representative testimony, the use of a special master and other aggregate analysis. *See, e.g., McLaughlin v. Ho Fat Seto*, 850 F.2d 586, 589 (9th Cir.1988), *cert. denied*, 488 U.S. 1040, 109 S.Ct. 864, 102 L.Ed.2d 988 (1989) (using "the fairly representative testimony of other employees" to award back pay); *Taylor*, 2015 WL 2358248, at *15 ("[U]npaid wage claims can be calculated in a readily manageable trial by using experts to prepare questionnaires to acquire survey data and/or to evaluate a statistically relevant sampling of [plaintiff] records[.]"); *Guifu Li v. A Perfect Day Franchise, Inc.*, 2012 WL 2236752, *13 (N.D.Cal.2012) (Finding that a sampling can establish class liabili-

ty where there was a failure to maintain accurate records and liability is established for unpaid wages); *Kurihara*, 2007 WL 2501698, at *11 (finding such an approach superior "given the alleged existence of a company-wide policy, the size of the class, and the relatively small amount of each individual claim").

### C. *Superiority.*

■■■■ "[T]he purpose of the superiority requirement is to assure that the class action is the most efficient and effective means of resolving the controversy. Where recovery on an individual basis would be dwarfed by the cost of litigating on an individual basis, this factor weighs in favor of class certification." *Wolin*, 617 F.3d at 1175–76 (citation and internal quotation marks omitted). In cases in which plaintiffs seek to recover relatively small sums and the disparity between litigation costs and the recovery sought may render plaintiffs unable to proceed individually, "[c]lass actions may permit the plaintiffs to pool claims which would be uneconomical to bring individually." *Local Joint Executive Bd. of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1163 (9th Cir.), *cert. denied*, 534 U.S. 973, 122 S.Ct. 395, 151 L.Ed.2d 299 (2001) (further finding that "[i]f plaintiffs cannot proceed as a class, some—perhaps most—will be unable to proceed as individuals because of the disparity between their litigation costs and what they hope to recover") (internal quotation marks and alteration omitted).

■■ Although courts considering wage and hour cases under California law routinely find that the class action device is superior to other forms of adjudication,[33] *see, e.g., Leyva,*

---

33. The California Supreme Court has acknowledged, in the context of a representative action under Cal.Code Civ. Proc. § 382, that wage and hour disputes should, given the "remedial" nature of California's labor laws, routinely proceed as class actions. *See, e.g., Sav–On Drug Stores, Inc. v. Superior Court*, 34 Cal.4th 319, 340, 17 Cal.Rptr.3d 906, 96 P.3d 194 (2004) ("California's overtime laws are remedial and are to be construed so as to promote employee protection. And, as we have recognized, this state has a public policy which encourages the use of the class action device. By establishing a technique whereby the claims of many individuals can be

resolved at the same time, the class suit both eliminates the possibility of repetitious litigation and provides small claimants with a method of obtaining redress for claims which would otherwise be too small to warrant individual litigation.") (internal quotation marks and citations omitted). Additionally, independent of the nature of California's labor laws, the state Supreme Court has found that claims based on uniform employee policies are particularly well-suited for class treatment. *See, e.g., Brinker*, 53 Cal.4th at 1021 & 1033, 139 Cal.Rptr.3d 315, 273 P.3d 513 (applying Cal.Code Civ. Proc. § 382 and stating that "[c]laims alleging that a uniform policy con-

716 F.3d at 515; *Ortega v. J.B. Hunt Transp., Inc.,* 258 F.R.D. 361, 364–65 (C.D.Cal.2009) (certifying a class of nearly 6,000 employees who alleged that their employer failed to pay minimum wages, provide proper meal and rest periods, provide accurate wage statements, or provide wages due upon termination); *Kamar v. Radio Shack Corp.,* 254 F.R.D. 387, 391, 402 (C.D.Cal. 2008) (certifying a class of 15,000 employees who alleged that their employer's policies violated state reporting time and split-shift regulations); *Cicero v. DirecTV, Inc.,* 2010 WL 2991486, *4 (C.D.Cal.2010) ("Courts commonly certify class actions pertaining to wage and hour issues."); *Arrendondo v. Delano Farms Co.,* 2011 WL 1486612, *17 (E.D.Cal.2011) ("Courts recognize that employer practices and policies with regard to wages and hours often have an impact on large numbers of workers in ways that are sufficiently similar to make class-based resolution appropriate and efficient."), defendant argues that a class action is not a superior means to redress the issues in this wage and hour case. (*See* Opp. at 23–24). Defendant asserts that

> [t]he crux of Plaintiff's complaint is that she allegedly once had to wait 20 minutes for a manager to check her bag. If so, her annoyance is understandable but it should not be a "federal case." Plaintiff could easily avail herself of the Berman hearing procedures under the California Labor Code.

(*Id.* at 24).

Defendant's assertions are unpersuasive and somewhat disingenuous, for defendant knows this case is about more than plaintiff having to wait 20 minutes for a bag check. Trivializing plaintiff's claim, (*see, e.g.,* Opp. at 1) (referring to plaintiff's claim as an "isolated gripe"), is neither persuasive nor well-taken. After all, when Ulta removed this

matter from state court, thereby turning it into the "federal case" it now disparages, it pled that "the amount in controversy for the putative class members in the aggregate exceeds the sum or value of $5,000,000[.]" (NOR at ¶ 3). Nonetheless, the fact that a Berman hearing [34] process is available to plaintiff does not mean that proceeding as representative of a class in federal court is not a superior method of adjudication. *See, e.g., Kurihara,* 2007 WL 2501698, at *11 ("The availability of administrative hearings for the relatively small amounts at issue on behalf of each individual class member does not dissuade this court from determining that a class action is superior overall to other forms of relief."); *Wang v. Chinese Daily News, Inc.,* 231 F.R.D. 602, 614 (C.D.Cal. 2005), *rev'd on other grounds,* 709 F.3d 829 (9th Cir.2013) ("In fact, under the California Labor Code, an employee may seek administrative relief by filing a wage claim with the commission *or, in the alternative,* may seek judicial relief by filing an ordinary civil action[.]") (internal quotation marks omitted; emphasis in original).

A class action is a superior method of adjudication when "few class members would have any meaningful redress" against Ulta because few potential class members could afford to undertake individual litigation. *See Chamberlan v. Ford Motor Co.,* 223 F.R.D. 524, 527 (N.D.Cal.2004) ("[I]n the absence of a class action, few class members would have any meaningful redress against [defendant] as a practical matter."); *see also Leyva,* 716 F.3d at 515 ("In light of the small size of the putative class members' potential individual monetary recovery, class certification may be the only feasible means for them to adjudicate their claims."); *Rai,* 308 F.R.D. at 265 (further finding that "it would be both redundant and a wildly inefficient use of limited judicial resources for each [employee] to file

---

sistently applied to a group of employees is in violation of the wage and hour laws are of the sort routinely, and properly, found suitable for class treatment").

**34.** A "Berman hearing" is a procedure under Cal. Lab.Code § 98, which provides for an administrative wage adjudication process. *See Sonic–Calabasas A, Inc. v. Moreno,* 57 Cal.4th 1109, 1127–28, 163 Cal.Rptr.3d 269, 311 P.3d

184 (2013), *cert. denied,* —— U.S. ——, 134 S.Ct. 2724, 189 L.Ed.2d 763 (2014). "A Berman hearing is conducted by a deputy [labor] commissioner, who has the authority to issue subpoenas [ ] ... [and] is designed to provide a speedy, informal, and affordable method of resolving wage claims." *Id.* at 1128, 163 Cal.Rptr.3d 269, 311 P.3d 184 (internal quotation marks and citation omitted).

an individual lawsuit alleging claims for their unpaid wages") (internal quotation marks omitted). In this case, even if plaintiffs could afford to bring their own claims, it would result in thousands of trials re-litigating the same legal and factual questions about Ulta's exit inspection policies and practices.

Further, "[e]ven if such individual lawsuits were economically feasible, the chance these individual suits would convince [defendant] to reform its conduct is infinitesimal." *Rai,* 308 F.R.D. at 265 (internal quotation marks omitted). Finally, as in *Rai,* the court has "already concluded that individualized inquiries about each [employee's] conduct do not predominate over common questions.... [C]ertification will not generate any complexities from a case management perspective." *Id.* at 266; *see also Taylor,* 2015 WL 2358248, at *17 ("Where, as here, all class members' allegations are based on uniform policies and practices giving rise to predominantly common questions of fact and law, a class action is superior."). This is particularly true where, as here, the court has already determined that dividing the class into subclasses will help the court maintain efficient and streamlined trial proceedings. *See supra* at § II.A.

As to any individualized issues of damages, the court could adjudicate liability and conduct a second phase of the trial, or appoint a special master to assess damages.[35] *See, e.g., Leyva,* 716 F.3d at 515 (stating that "[t]he district court, or a special master appointed under Federal Rule of Civil Procedure 53, could [analyze defendant's timekeeping database] to calculate damages once the court adjudicates liability"); *Jimenez v. Allstate Ins. Co.,* 765 F.3d 1161, 1167–68 (9th Cir. 2014), *cert. denied,* —— U.S. ——, 135 S.Ct. 2835, 192 L.Ed.2d 886 (2015) (affirming bifurcation of class action proceedings into liability phase and damages phase; stating that "[t]his split preserved both [the defendant's] due process right to present individualized

defenses to damages claims and the plaintiffs' ability to pursue class certification on liability issues based on the common questions of whether [the defendant] violated California labor law"); *Bowerman v. Field Asset Services, Inc.,* 2015 WL 1321883, *13 (N.D.Cal.2015) ("This is precisely the sort of trial plan that has been approved on numerous occasions in this circuit and elsewhere, both before *Dukes* and after."); *Ellis v. Costco Wholesale Corp.,* 285 F.R.D. 492, 539 (N.D.Cal.2012) (certifying a class under Rule 23(b)(3) where under a two-phase trial plan, "individual class members will present their claims for relief in a second phase of trial if liability is established, and [d]efendant will have an opportunity to present individualized defenses with respect to each class member").

Finally, any class member who wishes to control his or her own litigation may opt out of the class. *See* Fed.R.Civ.P. 23(c)(2)(B)(v). However, "other pending litigation is evidence that individuals have an interest in controlling their own litigation[,]" *see* 2 *Newberg,* § 4:70 at p. 277 (emphasis omitted), and the court must consider "the extent and nature of any litigation concerning the controversy already begun by or against class members[.]" *See* Fed.R.Civ.P. 23(b)(3)(B). Nonetheless, the "presence of a few other suits does not undercut [the court's superiority] conclusion[,]" as the filing of but a few cases indicates that a minute percentage of the class has an interest in individual litigation." 2 *Newberg,* § 4:70 at p. 278–79; *see also Pfaff v. Whole Foods Market Group, Inc.,* 2010 WL 3834240, *7 (N.D.Ohio 2010) (finding that the existence of "[o]nly one other lawsuit" concerning the subject matter of the case, seeking a one-state-only class, did not weigh against certification).

In May 2015, Ulta employee Michelle Paez filed a class action suit in California state court against Ulta on behalf of non-exempt California employees and on the basis of the bag check policy. (*See* Case No. CV 15–

---

**35.** The court retains discretion to certify "particular issues" under Rule 23(c)(4) that are common to all members of the class and apply Rule 53 to appoint a special master to adjudicate remaining issues related to damages. *See, e.g., Lilly v. Jamba Juice Co.,* 308 F.R.D. 231, 244 (N.D.Cal.2014) ("[T]he Court will exercise its discretion pursuant to Rule 23(c)(4) of the Federal

Rules of Civil Procedure to certify the proposed class solely for the purposes of determining liability."). Should it become clear through the course of trial or with additional discovery that certain liability issues that appear to be common at this time are in fact individualized, a special master could adjudicate those remaining issues as well.

1233–FMO (AGRx) ("*Paez* action"), Notice of Removal ("*Paez* NOR"), Exh. A (Complaint) at ¶¶ 14, 20–23). The *Paez* action was removed to this court on June 24, 2015. (*See Paez* NOR). In a case in the Northern District of California, Ulta employee Yvette Galvez filed a similar action ("*Galvez* action"). (*See* Defendant Ulta, Inc's Statement of Recent Decision ("Galvez Statement"), Exh. A, Dkt. No. 100–1). The portions of the *Galvez* action relating to Ulta's exit inspections have been stayed pending further order of this court.[36] (*See id.* at 4). That only two individuals—out thousands of putative class members—have initiated their own litigation suggests that there is little interest among individuals in controlling their own litigation, and to the extent that such interest exists, they and their attorneys understand that pursuing the claims as a class action is a superior method of adjudication. *See, e.g., Leyva*, 716 F.3d at 515 ("In light of the small size of the putative class members' potential individual monetary recovery, class certification may be the only feasible means for them to adjudicate their claims."). If anything, class certification in this case, particularly because the class will mostly (if not entirely) overlap with *Paez's* proposed class, suggests that class certification in the *Paez* action might not be sensible or superior to its current litigation posture. But the mere existence of the *Paez* and *Galvez* actions does not nullify or outweigh all the reasons, discussed above, that make class treatment the superior method of adjudication in this case. In short, the court finds that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed.R.Civ.P. 23(b)(3).

### *CONCLUSION*

Based on the foregoing, IT IS ORDERED THAT:

1. Plaintiff's Motion for Class Certification (Document No. 64) is granted. The court certifies the following class with respect to all of plaintiff's claims:

> Current and former non-exempt employees who were employed by Ulta and who worked in any Ulta store in California at any time from March 2, 2008, through the conclusion of this action. The class shall be divided into subclasses as follows:
>
> (a) Non-exempt workers who underwent exit inspections during their rest breaks.
>
> (b) Non-exempt workers who underwent off the clock exit inspections during their meal breaks.
>
> (c) Non-exempt workers who underwent off the clock exit inspections at the end of their shifts.
>
> (d) Non-exempt workers who underwent off the clock exit inspections at the end of the closing shift.

2. The court hereby appoints Sarah Moore as representative of the class.

3. The court hereby appoints The Blanco Law Firm, PC, Hobbs Law Group, and Wilson Trial Group as class counsel.

---

**36.** The proposed class in the *Galvez* action is somewhat different, as plaintiff seeks to certify a class of all Ulta retail employees with the following subclasses: (1) all employees who received an ATM card as their final form of payment; (2) all current employees who have received at least one itemized wage statement; and (3) all former employees who received an itemized wage statement along with their final wages. (*See* Galvez Statement, Exh. A at 2). In addition to causes of action related to exit inspections, Galvez claims that Ulta committed other Labor Code violations "by failing to timely pay all wages due upon her separation by issuing ATM cards, which impose certain fees, as the form of her final payment and by failing to keep accurate records of employees' hours and gross pay." (*Id.*).